Jeffrey **KRINSK**, Plaintiff,

v.

**FUND ASSET MANAGEMENT, INC., Merrill Lynch Asset Management, Inc., Merrill Lynch, Pierce, Fenner & Smith Incorporated, Merrill Lynch & Co., Inc. and CMA Money Fund, Defendants.**

No. 85 Civ. 8428 (JMW).

United States District Court, S.D. New York.

June 27, 1988.

Milberg Weiss Bershad Specthrie & Lerach by Richard M. Meyer, Melvyn I. Weiss, Jonathan Mack, New York City, for plaintiff Jeffrey Krinsk.

Rogers & Wells by James N. Benedict, Mark Holland, Jordan D. Cooper, Barry W. Rashkover, New York City, for defendants Fund Asset Management, Inc., Merrill Lynch Asset Management, Inc., Merrill Lynch, Pierce, Fenner & Smith Inc. and Merrill Lynch & Co., Inc.

Brown & Wood by James K. Manning, Paul Windels III, New York City, for defendant CMA Money Fund; Philip L. Kirstein, Sr. Vice President and Gen. Counsel, Merrill Lynch Asset Management, Inc., Plainsboro, N.J., of counsel.

## OPINION

WALKER, District Judge:

## Index to the Opinion

| | Page |
|---|---|
| Introduction | 475 |
| I. Background | 476 |
| A. The CMA Program | 476 |
| B. Merrill Lynch & Co. and its Affiliates | 478 |
| C. Fees Paid by the Fund and its Shareholders | 478 |
|   1. The Service Fee | 479 |
|   2. The Advisory Fee | 479 |
|   3. The 12b–1 Payments | 479 |
| D. The Trustees | 479 |
|   1. Information Available to the Trustees | 479 |
|   2. Consideration of the Advisory Fee | 481 |
| E. The 12b–1 Plan | 482 |
|   1. Adoption of the Plan | 482 |
|   2. Continuation of the Plan | 484 |
| II. The Law | 485 |
| III. Findings And Conclusions as to the § 36(b) Claims Introduction—The Fund as a Component of the CMA Program | 486 |
| A. Nature and Quality of Services Provided to Shareholders | 486 |
|   1. MLAM's Services | 487 |
|   2. Shareholder Services | 488 |
| B. Profitability to Merrill Lynch from the Fund | 489 |
|   1. Financial Consultants and Rule 12b–1 Payments | 490 |
|   2. Monthly Statement, New Account Processing and Marketing Costs | 492 |
|   3. Float Costs, Systems Excess Capacity, Imputed Income and Wire and Order Costs | 492 |
|   4. Corporate Overhead | 493 |
|   5. Conclusion as to Profitability | 494 |
| C. Fall–Out Benefits | 494 |
|   1. Primary Fall–Out Benefits | 494 |
|   2. Secondary Fall–Out Benefits | 495 |
| D. Economies of Scale | 496 |
| E. Comparative Expense Ratios and Advisory Fees | 496 |
|   1. Expense Ratio | 497 |
|   2. Advisory Fee | 497 |
| F. The $65 CMA Service Fee | 497 |
| G. Rule 12b–1 Plan Fees | 498 |
| H. The Trustees: Expertise, Knowledge, Care | 501 |
| I. Conclusion as to the § 36(b) Claim | 502 |
| IV. The Proxy Statement Claims | 503 |

## INTRODUCTION

Plaintiff Jeffrey Krinsk brought this derivative action on behalf of the CMA Money Fund ("Fund"), under the Investment Company Act of 1940, as amended, 15 U.S.C. § 80a–1 *et seq.* (the "Act"), to recoup allegedly excessive advisory fees paid by the Fund to its investment advisor. Defendants are Fund Asset Management, Inc. ("FAMI"), Merrill Lynch Asset Management Inc. ("MLAM"), Merrill Lynch, Pierce, Fenner & Smith Incorporated ("MLPFS"), Merrill Lynch & Co., Inc. (collectively, "Merrill Lynch"), and the Fund. At all times relevant to this action, plaintiff has been a shareholder of the Fund.

Krinsk commenced this action on May 16, 1985,[1] seeking initially to recover for the

---

**1.** This is not the first action to challenge as excessive the fees received by Merrill Lynch for managing the Fund. Two previous lawsuits challenged as excessive the Fund's advisory and

Fund all investment advisor compensation determined to be excessive for the period January 1, 1980 to May 16, 1985. On May 1, 1986, this Court held that the one year statute of limitations in § 36(b) of the Act restricts plaintiff's claim to recoupment of fees paid to the investment advisor after May 17, 1984. *Krinsk v. Fund Asset Management, Inc.,* Slip Op. 85 Civ. 8428 (JMW), 1986 WL 205 (May 1, 1986).

Plaintiff's first amended complaint alleged that the defendants had violated §§ 12(b), 15, 20 and 36(b) of the Act. On March 4, 1987, this Court dismissed the §§ 12(b) and 15 claims and struck plaintiff's demand for a jury trial. *Krinsk v. Fund Asset Management, Inc.,* 654 F.Supp. 1227 (S.D.N.Y.1987). At the subsequent bench trial, beginning March 16, 1987, the Court heard evidence on plaintiff's remaining claims: (1) that for the period May 17, 1984 to December 31, 1986, fees were paid to the investment advisor in violation of the advisor's fiduciary duty under § 36(b); and (2) that the 1984 Fund proxy statement distributed to CMA Fund shareholders by the defendants contained materially misleading statements.

The Court has carefully appraised the testimony of the witnesses in the context of their demeanor, interests and expertise, examined the numerous documents received in evidence and conducted a word-by-word review of the trial transcript. For the reasons stated below, the Court finds for defendants on both claims and dismisses the complaint. This opinion constitutes the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52.

## I. *Background*

### A. *The CMA Program*

The Fund is one component of a financial services package offered by Merrill Lynch called the Cash Management Account program ("CMA program"). Since, as all parties agree, the Fund must be considered in the context of the CMA program as a whole, it is necessary to explain that program and its operation in some detail.

The CMA program links together (1) a traditional securities brokerage account (the "securities" or "margin" account); (2) a savings vehicle consisting of one of three money market funds (one of which is the Fund) or an insured savings account; (3) a VISA debit card; (4) check-writing privileges; and (5) a comprehensive monthly statement. Merrill Lynch requires each incoming CMA participant to invest $20,000 in cash and/or securities; however, the participant need not maintain a minimum balance.

Merrill Lynch introduced the CMA program in 1977. From 1977 through 1986 the number of CMA participants grew from 34,792 to over one million. Although Merrill Lynch was the first to offer such a product, generically known as a central asset account, today many of the firm's competitors offer similar products.

The parties agree that the focal point of the CMA program is the securities account. T. 452 (Zeikel).[2] Through it, CMA participants may purchase or sell securities on "margin" (credit) or with cash. Although Merrill Lynch offers no discount brokerage rates as part of the CMA program, individuals may negotiate with Merrill Lynch for reductions in the price of their transactions on the basis of the value of their securities business. T. 755–6 (Zeikel); 890–92 (Walsh).

CMA participants are an important source of commission revenue to Merrill Lynch. CMA securities accounts generate an average of $1,200 in commissions per year, while other Merrill Lynch securities accounts produce on average only $400 in commissions per year. T. 990 (White); Px. 26. As of December 31, 1986, the CMA brokerage accounts constituted one-fourth of all Merrill Lynch brokerage accounts, yet produced approximately one-half of Merrill Lynch's brokerage commission revenues.

distribution fees for the years 1979 to 1984 under § 36(b) of the Act. *See Rosenfeld v. Merrill Lynch Asset Management, Inc., et al.,* 80 Civ. 6122 (TPG) (S.D.N.Y. filed October 28, 1980); *Kalman v. CMA Money Fund, et al.,* 81 Civ. 2574 (TPG) (S.D.N.Y. filed March 10, 1981). Plain-

tiffs in those actions voluntarily dismissed those actions.

2. References to "T" are to the trial transcript; names to witnesses; Dep. to deposition; Px. and Dx. to exhibits of plaintiff and defendants, respectively.

A significant component of the CMA program is the primary savings vehicle or money account. In selecting a savings vehicle, the CMA participant chooses either one of three money market funds—the CMA Money Fund, the CMA Government Securities Fund, the CMA Tax–Exempt Fund—or the Insured Savings Account, a money market deposit account opened by Merrill Lynch on behalf of the participant at one or more banks or savings and loan institutions. Px. 75c. A participant is free to switch his designation of the primary savings vehicle at any time, and at any time may hold shares in more than one CMA savings vehicle.

The CMA program links the securities account to the primary savings vehicle through a "sweep" feature. Uninvested cash or "free credit balances" generated in the securities account through, for instance, payment of dividends or sale of securities, are swept automatically into the money account. Px. 2, 4, 6, 75a. When a participant's free credit balance is $1,000 or more, it is swept that day for investment the following day. Balances less than $1,000 are swept weekly.

The subject of this lawsuit, the CMA Money Fund, is a no-load, diversified, open-ended investment company registered under the Act. As of January 5, 1987, assets invested in the Fund exceeded $19 billion, making the Fund the largest money market mutual fund registered under the Act. T. 511 (Zeikel); Dx. A. Approximately 75% of Merrill Lynch's CMA participants hold assets in the CMA Money Fund.

The Fund seeks the current income and preservation of capital and liquidity available from investing in a diversified portfolio of short-term money market securities. Fund dividends are declared and reinvested daily in the form of additional shares, each worth about $1. The participant's investment in the Fund is represented by the number of shares he holds. A shareholder may redeem or purchase additional shares in any amount without incurring a transaction charge.

The VISA debit card and check-writing privileges are tied to the savings vehicle and securities account. These components of the CMA program provide Fund shareholders with immediate access to money deposited in the Fund and to margin credit. With each VISA card use, the shareholder's account is debited immediately after the transaction clears. The time between the date of transaction and date of clearing is approximately five days, during which time the shareholder has interest-free use of his or her money. T. 889 (Walsh). VISA transactions are handled through the Merrill Lynch Bank and Trust Co., a banking subsidiary of Merrill Lynch. Since the CMA program links the VISA card to the securities account as well as to the primary money account, the VISA cards may be used for larger purchases on margin.

The check-writing privileges are offered through Bank One, Columbus Ohio, which clears the checks and looks to MLPFS for payment. In 1986 MLPFS processed 54,855,708 checks, an average of four per month per shareholder. Dx. C. These checks averaged $745 in amount. T. 69 (Livingstone).

When a customer's check or VISA transaction clears, Merrill Lynch pays the debt first out of any free credit balance, then out of the Fund or any other savings vehicle and, finally, from the available margin loan value of securities in the customer's account, the total of these comprising the authorization limit for check or VISA transactions. Px. 75. Interest charged on margin loans is based upon the "broker call rate", the rate at which brokers can borrow and lend.

Merrill Lynch sends each CMA participant a comprehensive monthly statement, containing both a summary of the account balances, investment income earned, and account activity,[3] and more detailed information about securities account holdings and CMA account activity during the month.[4] Due to their length and detail, the

---

3. The summary identifies the shareholder's cash holdings, CMA Money Fund balance, balance of any other money funds, priced investments, the margin loan value of securities and the shareholder's authorization limit, investment income earned during the month and for the year to date, account activity during the month and the average rate of return of the Fund.

4. Included is information regarding securities and options bought or sold, whether on margin

monthly statements takes MLPFS one week to print. CMA participants also receive a year-end tax statement summarizing their taxable activities over the year.

## B. *Merrill Lynch & Co. and its Affiliates*

MLAM and FAMI provide the management services and MLPFS provides the shareholder services necessary to support the CMA program. FAMI is a wholly-owned subsidiary of MLAM which in turn is a wholly-owned subsidiary of Merrill Lynch. Both FAMI and MLAM are registered as investment advisors under the Act.[5]

MLAM is investment advisor to between 40 and 50 mutual funds as well as institutional and individual investors. T. 450 (Zeikel). The Merrill Lynch Ready Assets Trust ("RAT") is among the funds that receive investment advisory services from MLAM. MLAM manages approximately $82 billion, $32–$36 billion of which is held in money market accounts such as the RAT and the CMA Money Fund.

MLAM's management services to the Fund include: (1) general administrative services, such as supervision of financial and accounting matters and tax compliance; (2) fund organizational services such as preparation of materials for director and shareholder meetings; and (3) portfolio management in compliance with the Fund's investment objectives and legal requirements. In managing the Fund's portfolio, MLAM has access to the research work of the MLPFS Security Research Division and Merrill Lynch Economics, Inc. Dx. 18.

MLPFS, a subsidiary of Merrill Lynch and the largest securities firm in the United States, services the individual CMA accounts. *Id.* MLPFS is responsible for processing new accounts, VISA and checking services, for printing and distributing the monthly statement, and for responding to customer inquiries.[6] It also provides the sophisticated computer system linking the various components of the CMA program.

The point of contact between MLPFS and the CMA program participant is the MLPFS account executive, denominated a "financial consultant," of whom MLPFS has 11,000. Patrick Walsh, manager of the Merrill Lynch Asset Accumulation Group, described the financial consultant's role at Merrill Lynch as "basically to satisfy the needs of his clients and to provide his clients with financial advice and information regarding trading and helping his client with his finances." T. 869. From Merrill Lynch's perspective, the financial consultant's principal function is to effect securities transactions on which MLPFS earns commissions. In turn, MLPFS compensates the financial consultants by paying commissions on these transactions, whether for CMA customers or non-CMA customers. In addition, financial consultants receive .11% of the Fund Assets under their supervision, pursuant to a "12b–1" plan, discussed below. Financial consultants are assisted by sales assistants.

## C. *Fees Paid by the Fund and its Shareholders*

As compensation for the services of MLAM and MLPFS, the Fund and its shareholders pay three fees: an annual service fee paid to MLPFS by all CMA program participants; the investment advisory fee paid by the Fund to MLAM; and payments made by the Fund to MLPFS pursuant to a 12b–1 plan, nearly all of which is passed on to the financial consultants.

---

or paid for; any other type of transaction in the securities account; daily activity in the CMA money accounts and securities accounts; each VISA and check transaction with the check number or the location of the VISA transaction, the date of transaction, date of clearance, amount and payee.

**5.** MLAM actually provides the advisory services. Since FAMI is merely the corporate vehicle with whom the Fund contracted for services, the Court will refer to the investment advisor collectively as MLAM.

**6.** MLPFS is a broker in securities, options contracts, commodities and financial futures contracts, and selected insurance products. It is a dealer in options and corporate and municipal securities. MLPFS is also an investment banker.

### 1. *The Service Fee*

Merrill Lynch charges an annual fee to each CMA program participant, including those who have chosen savings vehicles other than the CMA Money Fund. The fee appears on the CMA program monthly statement and is paid on the anniversary of the participant's entrance to the program by a cash debit or by selling fund shares.

The fee rose from $20 at the program's inception in 1977, to $50 in 1984, and then to $65 in December 1985, its current level. Walsh testified that the fee was raised to $65 upon his recommendation, and that he advocated the change because "with all the resources and all of the commitments we had made to the account, our account at that time was one of the lowest priced in the market place, and we just decided that we should get up to where everyone else was as far as the fees were concerned...." T. 948. The Fund's Trustees played no role in the decision to raise the program fee in 1985.

### 2. *The Advisory Fee*

The Fund pays a percentage of the total assets in the Fund as an advisory fee to its investment advisor, MLAM, according to the following schedule:

.50% up to $500 million of average net assets (50 basis points) [7];

.425% in excess of $500 million but not exceeding $1 billion of average net assets (42.5 basis points);

.375% in excess of $1 billion of average net assets (37.5 basis points).

Amounts paid by the Fund under the advisory agreements for the years ending December 31, 1984-86 were:

| | Fee Paid | effective rate |
|---|---|---|
| 1986 | 68,996,608 | .38 |
| 1985 | 63,939,204 | .38 |
| 1984 | 52,934,492 | .38 |

Dx. A. The Fund Trustees and Fund shareholders approve the fee on an annual basis.

The fee scale has remained unchanged since October 11, 1979 when the Fund's assets totalled $605 million. From June 1983, when the Fund stood at approximately $12 billion in assets, until March 1986, when the Fund was at about $18 billion, the effective fee rate decreased less than one-fourth of a basis point—.0023%.[8] Px. 17.

### 3. *The 12b–1 Payments*

Since September 1, 1983, the Fund has paid .125% of the Fund's assets (12.5 basis points) to MLPFS for distributing Fund shares. These 12b–1 payments are remitted to MLPFS pursuant to a Distribution Agreement and a Shareholder Servicing and Distribution Plan ("12b–1 plan").[9] As noted above, under the 12b–1 plan MLPFS passes through 11 basis points to the financial consultants. MLPFS pays 1 basis point to sales management, and up to .50 of a basis point is kept by MLPFS to offset administrative costs of the program. T. 602–03 (Zeikel); White Dep. 52–53.[10]

### D. *The Trustees*

#### 1. *Information Available to the Trustees*

The Fund is governed formally by a Board of Trustees (the "Board" or the "Trustees") consisting of Messrs. Zeikel, Colgan, Forbes, White, O'Reilly, Lenagh, and West, of whom only Zeikel is formally affiliated with Merrill Lynch, as a vice-pres-

---

**7.** A "basis point" equals .01%.

**8.** From September 1979 to June 1981, as Fund assets increased from $605 million to $7 billion, the effective advisory fee rate dropped from .4869 to .3867. Since then, due to an ever-increasing proportion of assets generating a fee rate of .375, little change in the effective advisory fee rate has occurred.

**9.** Pursuant to Rule 12b–1, 17 CFR § 270.12b–1 (1987), promulgated under the Act, the trustees of a registered open-end management investment company may adopt a written plan for use of fund assets in distribution of fund shares. The plan, and any agreement with any person relating to implementation of the plan must be adopted in conformance with the standards outlined by the Securities and Exchange Commission in Rule 12b–1. The Rule is discussed in greater detail, *infra* at § III.F.

**10.** The financial consultants receive an average of $3,000 in 12b–1 payments each year. This constitutes approximately 3% of their total commission income.

ident. The unaffiliated Trustees, who have their own, separate counsel, comprise the Fund's Audit Committee and Nominating Committee. T. 1334 (West).

The Board's principal responsibility is to evaluate the advisory fee annually and the 12b–1 plan quarterly in light of the interests of the shareholders. The Board also oversees the investments and administration of the Fund. T. 515 (Zeikel). The Board meets regularly four times a year and at special meetings. *Id.* at 516. The day-to-day management of the Fund is left to MLAM.

In Audit Committee meetings, held immediately prior to full Board meetings, the unaffiliated Trustees review matters relevant to Fund administration, such as the 12b–1 plan and the fund's portfolio management. Zeikel, the only affiliated Trustee, is occasionally invited to attend or make presentations at Audit Committee meetings, as are other Merrill Lynch personnel. *See* T. 1336–37 (West).

All six unaffiliated Trustees joined the Board at Merrill Lynch's invitation.[11] All serve on other Merrill Lynch fund boards. Each receives total compensation from Merrill Lynch in a range from $50,000–86,000 annually for board service. *See e.g.*, T. 404 (Colgan); T. 1332 (West); T. 1489 (Forbes).

In order to aid the Trustees in their deliberations, the Merrill Lynch organization provides them with extensive information, including memoranda relevant to the advisory and distribution agreements. In 1984, for example, the unaffiliated Trustees received a "Green Book", Px. 15, which discussed, *inter alia*, the role of the unaffiliated Trustees, litigation affecting the Money Fund, FAMI and MLPFS management and distribution proposals and alternatives to those proposals, and a legal analysis of the reasonableness of management compensation, with discussion of both *Gartenberg I* and *Gartenberg II*.[12] The 1984 Green Book also included lengthy memoranda on the advisory agreement and the 12b–1 plan.[13] In 1985 and 1986, the Trustees received Green Books with even more detailed information. Px. 16, 17. All three Green Books contained informational exhibits relevant to Trustee deliberations. *See* T. 1340 (West).

In 1985 and 1986, counsel to Merrill Lynch prepared a Directors Manual and sent it to all Merrill Lynch fund trustees, including the Trustees of the Fund. Px. 18, 19. Each Manual included an exhaustive memorandum describing the factors to be considered by the Trustees in evaluating investment advisory fees, an extensive presentation of the legal requirements of Rule 12b–1 and information concerning 12b–1 plans adopted by the MLAM-sponsored funds. It also included the trial and appellate court opinions in the *Gartenberg* litigation. Additionally, the Manual informed the Trustees about the structure of the MLAM organization and MLAM's services to Merrill Lynch money market fund shareholders, as well as other Trustee responsibilities such as selection of independent accountants.

---

**11.** The shareholders, of course, voted their approval of the Board members. Members coming onto the Board after the inception of the Fund also received approval from the other Board members.

**12.** *Gartenberg v. Merrill Lynch Asset Management, Inc.,* 528 F.Supp. 1038 (S.D.N.Y.1981), *aff'd* 694 F.2d 923 (2d Cir.1983) (*Gartenberg I*); *Gartenberg v. Merrill Lynch Asset Management, Inc.,* 573 F.Supp. 1293 (S.D.N.Y.1983), *aff'd* 740 F.2d 190 (2d Cir.1984) (*Gartenberg II*).

**13.** The Green Book also referred to profitability studies presented to the Trustees at full board meetings (the studies were appended as exhibits to the 1984 and 1985 Green Books); included a profitability statement of MLAM, exclusive of the revenues and expenses of other Merrill Lynch affiliates such as MLPFS; provided comparative information about advisory agreements of other funds, such as information on advisory fees, expense ratios and performance of other funds; summarized performance data; and contained operating expense information. It also included information about the 12b–1 plan, such as a description of the plan, a breakdown of the ways in which Merrill Lynch spent the payments, its impact on the expense ratio, total income and yield, and comparative tables on other funds with 12b–1 plans. Information necessary to other required Trustee approvals was also presented. The Green Book was prepared by Brown and Wood, counsel to The Fund.

Prior to each full Board meeting, the Trustees also received from Merrill Lynch a "preliminary agenda" for the full meeting which frequently contained additional information relevant to Trustee consideration of the investment advisory fee and 12b–1 plan.[14] *See e.g.* Dx. BF.

The Trustees received other periodic memoranda from the Fund and Merrill Lynch counsel updating them on legal developments in the investment company field. T. 1346 (West); Dx. BJ. The Trustees also received the proxy material for their review prior to its distribution to shareholders. T. 1362 (West).

The parties do not dispute, and the Court finds, that the Trustees were fully informed throughout the relevant period as to all matters relevant to any determination for which they were responsible.

### 2. Consideration of the Advisory Fee

In this case, the Trustees reviewed the materials received with regard to the advisory fee in light of the various *Gartenberg I* factors, discussed in detail below. Trustee White credibly explained that the material distributed to the Trustees included "a sort of tick-off sheet of various factors we have to follow." Dep. 17. He remarked that: "[g]enerally what we do in the group is go down those, some we can handle reasonably rapidly, some we spend more time discussing, but before we renew the agreement we've gone though every one of those factors." *Id.*

The factors reviewed by the Trustees included: (1) the nature and quality of services rendered to the shareholders by the Merrill Lynch organization; (2) the fees paid by the Fund and payable at projected asset levels, expense ratio and performance of the CMA fund; (3) comparative data on fees, expense ratios and performance of other funds; (4) advisory fees negotiated in the settlement of litigation under § 36(b); (5) the profits to Merrill Lynch directly attributable to the CMA Fund; (6) the wisdom and practicability of assessing "fall-out" benefits to Merrill Lynch and the hypothetical impact of these fall-outs on Merrill Lynch's profitability[15]; (7) possible economies of scale realized in managing such a large fund; and (8) the entrepreneurial risk to Merrill Lynch and losses incurred on the CMA program during the program's early years.[16]

The Trustees assessed the advisory fee's fairness in relation to the CMA program as a whole rather than in relation to the Fund in isolation. Trustee West testified that,

> the trustees talked at some length among ourselves and with others about what did it mean to talk about profitability, and the more we talked, the more convinced we all became that it really had to be looked at in the context of the profitability of this thing called the CMA program or product, that trying to pull out a piece of it and look at it as though it were a stand-alone piece, was trying to unscramble an omelet.

T. 1350; *see also* Lenagh Dep. 63.

West explained that the service fee and advisory fees offset the costs of the program as a whole and "if you can tell me exactly what is paying for what, you're a better man than I." T. 1460. Thus, the Trustees evaluated the fairness of the advisory fee in light of costs and benefits of the CMA program as a whole, not simply MLAM's management of the Fund.

**14.** Specifically, the agenda provided a MLAM commentary on the stock market for the period under review and described the trading activity of the Fund's portfolio, average life of the Fund's investments, the Fund's yield, annualized net return, and portfolio structure. It also included comparisons of the Fund's performance with that of other funds and other types of investments, a report on the Fund's transactions during the quarter, a statement of the Fund's operating expenses, assets and liabilities, and a listing of the Fund's size and number of shareholders.

**15.** Fall-out benefits are non-fee benefits to Merrill Lynch, such as securities revenues and margin interest, which result from Merrill Lynch's sponsorship of the CMA Fund. *See infra* § III. C.

**16.** In 1983, the Audit Committee focused heavily on comparative fees in the money market industry. Following *Gartenberg I,* the focus shifted to the profitability of the Fund to Merrill Lynch. *See* Px. 10, 12.

The unaffiliated Trustees concluded throughout the period at issue here that the advisory fee required no "fine-tuning."[17] Px. 10 at 9. On June 13, 1984, June 12, 1985 and June 11, 1986, the Trustees voted unanimously to approve renewals of the investment advisory fee challenged in this action. Dx. AN, Px. 11, Px. 13.

In 1984 the Audit Committee concluded that (1) the comparative information "confirmed the general appropriateness of the current fee schedule;" (2) the Peat Marwick & Mitchell ("PMM") full-cost profitability study, which showed overall direct losses for Merrill Lynch on the CMA Fund for the years 1982 and 1983, was the most accurate profitability study to date and provided no current basis for adjustment of the fee; and (3) a causal problem existed in assessing the benefit to Merrill Lynch of fall-out benefits from the Fund. Dx. AM. Despite this last conclusion, committee members were nonetheless furnished with information on all profits earned from securities transactions in CMA securities accounts.[18]

The Audit Committee reached similar conclusions in 1985 and 1986. In 1985, [m]embers of the committee concluded that the absence of evidence indicating that substantial economies of scale were realizable in the operation of the CMA program, coupled with the highly variable nature of the CMA program profitability, would make it problematic to attempt a "fine-tuning" of the Fund's established advisory compensation arrangements from year to year in a reaction to the CMA Program profitability estimates.

Px. 10. In June 1986, the Audit Committee reviewed a profitability study presented by Alan White, a Merrill Lynch employee, and the next day the full Board approved the advisory agreement. Px. 13.

### E. The 12b-1 Plan

#### 1. Adoption of the Plan

In March 1983, concerned by the erosion of Fund assets,[19] T. 1446-47 (West), T. 409 (Colgan), MLAM suggested the adoption of a 12b-1 plan to implement a sales incentive program, and provided the Trustees with a memorandum, prepared jointly by counsel for MLAM and the Fund, explaining Rule 12b-1 and the legal and financial considerations to be taken into account before adopting a 12b-1 plan. Dx. AW, AX. The Trustees rejected at least two 12b-1 plan proposals. On May 9, 1983, the Trustees received the 1983 Green Book which set forth information relevant to a decision whether to adopt the proposal in effect today.[20] Px. 14. This 12b-1 plan obligates the Fund to pay MLPFS .125% of its assets and requires MLPFS to channel the money to the financial consultants and managerial staff, as compensation "for selling [Fund shares] and for providing direct personal services to shareholders, including furnishing information as to the status of Fund accounts and handling purchase and redemption orders for Fund shares." Px. 17 at 523. The plan, one of the least expensive 12b-1 plans in effect,[21] prohibits the

---

**17.** There is no probative evidence that the Trustees ever considered internalization of advisory services or the retention of an alternative advisor.

**18.** These overall benefits to Merrill Lynch stood at about $105 million in both 1982 and 1983, according to the PMM study, representing a return on revenue of 12.5% and 9.2% respectively. Dx. AM.

**19.** This erosion was part of a general trend of decreasing money market and brokerage account assets, which began after passage of the Garn-St. Germain Depository Institutions Act of 1982, Pub.L. No. 97-320, 96 Stat. 1469 (1982), permitting banks and savings and loan institutions to offer money market accounts and central asset accounts. See e.g. T. 589-91 (Zeikel).

**20.** The Green Book contained, inter alia, a description of the proposal, the requirements of Rule 12b-1, a comparative study from Lipper-Directors' Analytical Data on 12b-1 plans adopted by other funds as of November 18, 1982, the impact of the sales plan on the expense ratio, total income and yield of the Fund, a brief description of the reasons why MLAM suggested the plan, and director responsibilities in adopting it.

**21.** The Trustees had rejected a plan incorporating an 18 basis point fee as too expensive in comparison with competitors' fees. As reported by Lipper Analytical Securities Corporation, of the 415 mutual funds with 12b-1 plans, the Fund's fee is the fourteenth lowest. Dx. J-1.

use of the distribution fee to pay for other expenditures of MLPFS related to the Fund, such as sales contests, special seminars, or media advertising,[22] provides for quarterly reports to the Trustees, requires annual approval by both the full Board and the unaffiliated Trustees and is terminable at any time by a majority vote of the unaffiliated Trustees. Dx. AY at 10–11; Px. 17 at 523–6.

Approval of the plan followed formal Trustee consideration of the factors listed in SEC Investment Company Act Release No. 11,414 [23] and was based on practical concerns, such as, with the substantial recent erosion of Fund assets, that the Trustees and Merrill Lynch wanted financial consultants to induce CMA customers to place increased cash deposits in the Fund. The 12b–1 plan was an incentive program designed both to halt the outflow of Fund assets and to increase the size of the Fund. T. 1246 (West); T. 595–97 (Zeikel); T. 409 (Colgan); T. 920 (Walsh).

The Trustees were especially concerned with promoting the CMA program as a whole. Trustee Lenagh frankly stated: "I am more concerned about the CMA program than I am about the CMA money fund, in that the account executives are stimulated to sign up, maintain and service the CMA program and not the money fund per se." Dep. 34. Formal minutes of the Audit Committee also reflect a concern for the entire program. *See* Dx. AM.

In addition to their concern for the entire program, the Trustees believed that a larger Fund has advantages over smaller funds in the marketplace. The Trustees believed that bigger funds generally produce higher rates of return and that a decline in fund assets inhibits fund performance since a manager must then focus on liquidity needed to satisfy redemptions, rather than on investments that can increase yield. Zeikel explained, "[i]f one has a fully invested position and a new opportunity arises, then one can take advantage of it with the cash flow. If there is negative cash flow, one has to reduce the portfolio commitment to pay off the cash flow and then reduce it again to take advantage of the new commitment." T. 705. *See also* T. 1428–29 (West).

A secondary goal of the 12b–1 plan was to improve financial consultant services to shareholders. Barely mentioned at the time of the plan's adoption [24], this purpose

---

22. Previously the Trustees had rejected as inappropriate a proposal permitting the 12b–1 funds to be used for these purposes.

23. The Commission has suggested that the following factors are normally relevant to a decision to adopt a 12b–1 plan;

  (1) the need for independent counsel or experts to assist the directors in reaching a determination;

  (2) the nature of the problems or circumstances which purportedly make implementation or continuation of such a plan necessary or appropriate;

  (3) the causes of such problems or circumstances;

  (4) the way in which the plan would address these problems or circumstances and how it would be expected to resolve or alleviate them, including the nature and approximate amount of the expenditures; the relationship of such expenditures to the overall cost structure of the fund; the nature of the anticipated benefits, and the time it would take for those benefits to be achieved;

  (5) the merits of possible alternative plans;

  (6) the interrelationship between the plan and the activities of any other person who finances or has financed distribution of the company's shares, including whether any payments by the company to such other person are made in such a manner as to constitute the indirect financing of distribution by the company;

  (7) the possible benefits of the plan to any other person relative to those expected to inure to the company;

  (8) the effect of the plan on existing shareholders; and

  (9) in the case of a decision on whether to continue a plan, whether the plan has in fact produced the anticipated benefits for the company and its shareholders.
Investment Company Act Release No. 11414 (October 28, 1980).

24. Indeed the Audit Committee and full Board minutes of May 19, 1983, reflect no consideration by the Trustees of shareholder servicing. *See* Px. 9. The text of the plan, however, states that the payments are to compensate the financial consultants for the services they provide shareholders, and the Proxy Statement sent to shareholders states that Merrill Lynch, at least, reasonably believed this would occur. In addition, Zeikel and Colgan also refer to shareholder servicing as part of the initial considerations of the Trustees. T. 597, 604 (Zeikel); T. 415 (Colgan). Forbes testified that encouraging a flow

assumed greater importance in the Trustees' subsequent deliberations.

In 1983, the Trustees engaged no expert in connection with their consideration of adoption of the 12b–1 plan. In concluding that a large and growing fund was desirable, they relied upon the "casual empiricism" available to them as trustees of a very big fund and upon conversations with Merrill Lynch portfolio managers. *See* T. 1428 (West); White Dep. 30; Lenagh Dep. 26.

While the Trustees may have considered other methods of encouraging Fund growth and halting the exit of Fund assets than through a 12b–1 plan, *see* Px. 8 at 4, Trustee discussion centered upon "alternatives in the sense of variations on the plan." T. 1424 (West). The Trustees also considered such possible intangible benefits to Merrill Lynch as a lower turnover rate for financial consultants. T. 1425–26 (West).

All these deliberations led the Trustees to favor adoption of a 12b–1 plan. The Audit Committee believed the Plan could reduce redemptions and retain fund assets "in the face of competition from banks and other money funds." Px. 8. Despite the difficulties in assessing sales incentive programs, the Trustees believed that "failure to meet the[se] competitive threats [posed by other funds with 12b–1 plans] could result in substantial diminution of the Fund assets with concomitant increase in the expense ratio." *Id.* The effect of the plan on expense ratio and yield caused them no concern and they agreed that the pass-through feature of the plan meant Merrill Lynch profitability was not increased by the plan. They concluded "that the plan offered a reasonable prospect of significant benefits to the Fund and its shareholders and that the costs of the plan in relation to such benefits appeared reasonable." *Id.* At the full Board meeting on May 19, 1983, the Trustees adopted the plan.[25] Px. 9.

On June 10, 1983, Merrill Lynch described the 12b–1 plan approved by the Trustees in a proxy statement to shareholders. Dx. AY. The statement explained the terms of the plan, set out the Trustees' considerations, and included information on the effect of the plan on the expense ratio and yield, and information on comparative expense ratios and yields. The plan, approved by a majority of shareholders on July 26, 1983, went into effect on September 1, 1983.

### 2. Continuation of the Plan

The Trustees have reviewed the plan each quarter since it went into effect. As required by Rule 12b–1, Merrill Lynch relayed pertinent information to the Trustees, in the form of a 12b–1 report, prior to Audit Committee meetings.[26] The annual Green Book contained additional data.[27] In their review, the Trustees also discussed the plan with Fund portfolio managers, who described to the Trustees the advantages of managing a large and growing fund. T. 1429–30 (West).

Patrick Walsh ordinarily presented the 12b–1 report to the Audit Committee and added "anecdotal" information on the financial consultant response to the 12b–1 plan and the quality of service provided by the financial consultants to the shareholders. T. 1494 (Forbes). He opined, based on conversations with regional branch personnel, that "the 12b–1 plan was having a highly salutary effect in improving service provided to CMA shareholders and in providing a more positive attitude on the part of account executives with respect to the

---

of assets to the Fund was of great concern to the Trustees. T. 1492–93. *See also* T. 609 (Zeikel).

The Court finds that, in 1983, the Trustees focused their attention on the diminishing size of the Fund. Shareholder servicing was a secondary consideration.

**25.** As required by Rule 12b–1, the entire Board approved the plan and the unaffiliated Trustees approved it separately.

**26.** The Trustees were informed of MLPFS's disbursement of 12b–1 payments, the volume of CMA complaints, and the number of CMA account openings and closings. In the yearly Green Book, they received additional data, such as the effect of the payments on expense ratio and yield. They also received comparative information on other funds.

**27.** *See supra* fn. 13, fn. 20.

CMA program," Dx. AM., and that "12b–1 compensation made the financial consultants more receptive to dealing with Fund shareholder inquiries." Px. 12.

Although as of the trial there had been little research on the desirability of a growing fund, and none of it conclusive, the Trustees' belief therein had been strengthened, in part, by the views of portfolio managers, by enthusiastic financial consultants, and by the Fund's strong yield.[28]

The Trustees are convinced that the 12b–1 plan will keep the Fund growing and healthy. They view payments to the financial consultants as an effective means to encourage a strong financial consultant-CMA client relationship, an important concern given their perception of increasing competition in the money market and central asset account markets. Trustee Colgan stated that if the plan were to be discontinued "it would result in a diminution of interest on the part of the account executives and salesmen." Dep. 418. Such diminution of interest would derogate from Merrill Lynch's ultimate goal of "keeping [its] clients in a positive frame of mind as far as the CMA Money Trust is concerned." T. 919 (Walsh). However, although they view the plan as a success, the Trustees are aware that it is impossible to be certain how well the plan is actually working. *See e.g.* T. 1435 (West).

Following quarterly reviews of the factors listed in Investment Company Act Release No. 11,414, the Trustees have repeatedly approved the plan's continuation.

## II. *The Law*

Section 36(b) of the Investment Company Act of 1940 [29] places a "fiduciary duty" on an investment advisor with respect to receipt of payments from a registered investment company. This standard was fully explicated by Judge Mansfield in *Gartenberg I,* 694 F.2d at 923, 927–928.[30]

█ While a plaintiff bears the burden of proving a breach of the investment advisor's fiduciary duty under § 36(b), a plaintiff is not required to show personal misconduct on the part of the advisor, nor must the plaintiff meet the standard required to hold a fiduciary liable for corporate waste. *Id.* However, a district court is not empowered "to substitute its business judgment for that of a mutual fund's board of directors in the area of management fees." *Id.* at 928, quoting S.Rep. No. 91–184, 91st Cong., 1st Sess., *reprinted in* [1970] U.S.Code Cong. & Ad. News 4897, 4902–03 [hereinafter, the "Senate Report"].

Further, the legislative history to § 36(b) makes clear that the advisor is entitled to earn a profit from his services and that his fees need not be determined by "general concepts of rate regulation, such as those applicable to public utilities." Senate Report at 4902; *Schuyt v. Rowe Price Prime Reserve Fund, Inc.,* 663 F.Supp. 962, 972 (S.D.N.Y.1980), *aff'd* 835 F.2d 45 (2d Cir. 1987), *cert. denied,* —— U.S. ——, 108 S.Ct. 1594, 99 L.Ed.2d 908 56 U.S.L.W. 3753 (May 2, 1988).

*Gartenberg I* capsulized as follows the test for determining whether an advisor has breached its fiduciary duty: "essentially whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length in light of all the surrounding circumstances"

---

**28.** In 1986, Trustee Forbes described to the Trustees a study undertaken by Anthony Beavers, a graduate student at State University of New York at Albany, which confirmed their view that a positive correlation between fund size and net return exists. T. 1494–97. Zeikel credibly testified that studies showing a link between size and performance "reinforce[d] a view that [he] built out of [his] own experience." T. 635–37. Trustee Forbes was cross-examined at length as to a prior study he had co-authored that suggested the opposite conclusion. T. 1505–21.

**29.** Section 36(b) provides in relevant part that:

"The investment advisor of a registered investment company shall be deemed to have a fiduciary duty with respect to the receipt of compensation for services or payments of a material nature, paid by such registered investment company, or by the security holders thereof, to such investment advisor or any affiliated person of such investment advisor."

**30.** *See also Gartenberg II; Schuyt v. Rowe Price Prime Reserve Fund, Inc.,* 663 F.Supp. 962 (S.D. N.Y.1980) *aff'd* 835 F.2d 45 (2d Cir.1987), *cert. denied* —— U.S. ——, 108 S.Ct. 1594, 99 L.Ed.2d 908 (1988).

and not "so disproportionately large that it bears no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." 694 F.2d at 928.

In determining the reasonableness of the advisory fee, Congress "intended that the court look at all the facts in connection with the determination and receipt of such compensation, including all services rendered to the fund, its shareholders and all compensation and payments received...." Senate Report at 4910, quoted in *Gartenberg I,* 694 F.2d at 930.

In particular, the court in *Gartenberg I* suggested the importance of such factors as (1) "the expertise of the individual trustees of a fund, whether they are fully informed about all facts bearing on the adviser-manager's services and fee, and the extent of care and conscientiousness with which they perform their duties;" (2) the nature and quality of services provided to fund shareholders; (3) the advisor's cost in providing these services; (4) economies of scale realized by the advisor as the fund grows larger; and (5) the volume of orders that must be processed by the fund's advisor. *Gartenberg I,* 694 F.2d at 930; *Schuyt,* 663 F.Supp. at 972–973. The *Gartenberg I* court also suggested that, while comparisons with other industry advisory fees may be helpful, since competition among advisors for fund business "is virtually nonexistent, ... [r]eliance on prevailing industry advisory fees will not satisfy § 36(b)." 694 F.2d at 929.

■■] This suit differs from those brought in this Court under § 36(b) on prior occasions. For the first time, the Court is presented with a challenge to fees paid by a fund embedded in a central asset account. As noted earlier, all parties agree that the Fund cannot be viewed separately from the other program components. While the Court agrees with this view, it is also mindful that the issue before it is whether Merrill Lynch, and specifically MLAM, breached its fiduciary duty to the Fund alone in its receipt of the advisory fee.

The Court concludes that the location of the Fund within the CMA program is a "surrounding circumstance" which would pervade all aspects of a hypothetical arm's-length negotiation over the Fund's advisory fee. This fact is relevant to important considerations such as costs and benefits of the Fund to Merrill Lynch and services received and costs incurred by Fund shareholders.

## III. Findings and Conclusions as to the § 36(b) Claims Introduction—The Fund as a Component of the CMA Program

The CMA program, of which the Fund is a major component, provides advantages both to Merrill Lynch and to the shareholders. The shareholders benefit from the automatic sweep, the associated VISA debit card and check writing privileges and the comprehensive statement. Merrill Lynch benefits by maintaining under its roof and within the control of each financial consultant a greater share of the client's total assets. The uninvested portion of these assets is close at hand, available for investment. Thus the Court is not surprised that CMA participants generate three times the commission revenue of the non-CMA brokerage customer and that financial consultants are encouraged to prospect among Fund shareholders for commissionable transactions.

The degree to which the Fund's presence within the CMA program enhances Merrill Lynch's profitability from retail securities transactions was not established at trial. That some profit results seems self-evident and the Court has no hesitation in so finding. With this as background, the Court examines each of the factors set forth in *Gartenberg I* to evaluate the reasonableness of the compensation to the advisor and its affiliates in light of the fiduciary standards articulated in that decision.

## A. Nature and Quality of Services Provided to Shareholders

Services to the Fund are provided by MLAM and MLPFS. MLAM's management services include portfolio management and general administrative and organizational services. MLPFS provides

shareholder-related services for both the Fund and the CMA program.

### 1. *MLAM'S Services*

Plaintiff does not dispute the high quality of the general administrative and organizational services MLAM provides to the Fund. No evidence was presented indicating that such services, including legal compliance with regulatory requirements, management of relationships with auditors and bank custodian and transfer agents, provision of office space, equipment and personnel and preparation of materials for Trustee and shareholder review, were other than fully satisfactory.

With regard to the quality of MLAM's portfolio management services, the parties are in sharp dispute. Merrill Lynch points to the fact that, under MLAM's stewardship, the Fund's yield has consistently performed at or near the top of money market funds, whether or not such funds are part of central asset accounts.[31]

Plaintiff challenges these results by contending that the Fund's performance is below average when measured on a "risk-adjusted" basis. Plaintiff's expert Dr. Larry Selden compared mean return with weekly yield fluctuations of 104 money market funds. He found that the Fund had a higher degree of volatility or "risk" than the average fund and that once the return was adjusted downward to reflect the higher risk, the Fund's performance was below average.[32] Tr. 284–301; Px. 67A, 67B, 68A, 68B, 68C.

Selden admitted that neither the SEC nor the money market industry has adopted "risk adjusted performance" as an industry standard. T. 388. *See also* T. 567 (Zeikel). The Court is unwilling to impose on defendants a performance standard yet to be accepted by the regulatory authority overseeing investment company practices and thus rejects the concept of "risk-adjusted" return as a standard of fund performance measurement in this case.

Further, the yield fluctuations may be explained, at least in part, by the accounting method the Fund uses to report yield. The Fund "marks to market" all securities with a maturity of more than 60 days, meaning that the Fund's accounts reflect the current market value of these securities, a number which fluctuates daily according to the factors driving the market. Other funds use a variety of accounting methods: many amortize the difference between present value and value at maturity of an instrument over the life of the investment; others mark-to-market all or part of their fees. In short, the variety of accounting methods used, together with the varying effect of these methods on weekly yield fluctuations, tends to undermine Selden's comparisons of risk-adjusted performance.

Defendants do not argue that risk-adjusted performance, properly calculated to account for the different accounting methods,

---

**31.** As reported in *Donoghue's*, in 1984 the Fund's average yield was 10.55, in 1985 it was 8.12, and in 1986 it was 6.54. Dx. E–2, F–2, G–2. Over a three year period it earned an average yield of 8.40. Among all taxable retail money market domestic prime funds, its rank for 1984 was second out of 69, in 1985 it was second out of 73 and for 1986 it was ninth out of 73. Dx. H–2. Over the three year period it ranked third of 56. *Id.* Among all taxable retail money market funds, it was eighth of 174 in 1984, ninth of 152 in 1985 and twenty-first of 158 in 1986, ranking tenth of 129 over the three years. Dx. E–1, F–1, G–1, H–1. In relation to other money market funds associated with central asset accounts, it was first of nine in 1984, second of nine in 1985 and fourth of nine in 1986, for a three year ranking of second of nine. Dx. E–3, F–3, G–3, H–3. Thus, in comparison to other funds, the CMA money fund has been a consistently high performer.

**32.** Selden compared the volatility of 104 funds reported in *Donoghue's* from March 30, 1983 to December 31, 1986, by taking the standard deviation (a statistic which calculates deviations from the average) of their yields from week to week. He found that the CMA Money Fund's volatility was "roughly 25 per cent higher than the broad Donoghue average." T. 289. To determine "risk-adjusted return," Selden contrasted risk or volatility with yield by dividing the standard deviation for each fund into each fund's mean return. Calculated in this manner, the Fund's risk-adjusted return stood below the average of the 104 money funds. Selden repeated this analysis with a group of nine large funds, including the CMA Money Fund, to ensure that his result was not skewed by the size of the Fund. Among these, the Fund exhibited the lowest return on a risk-adjusted basis.

would be irrelevant to future Trustee deliberation over the Fund's fee and the Court does not so find. If a portfolio with greater volatility should be expected to earn a greater return to justify the investor's bearing that risk, then risk adjustment to the return would be appropriate. It appears possible to perform the appropriate calculations and the Trustees may wish to consider doing so to aid in future deliberations over the Fund's advisory fee.

The Court is satisfied that to the extent the Fund has enjoyed yield results superior to those of other funds, it is not happenstance. The portfolio manager Joseph Monagle was provided with the extensive research facilities of MLPFS which assess both the economy as a whole and individual securities. The Court credits Monagle's testimony that he trades aggressively [33] with a view to maximizing yield after closely monitoring a host of relevant market factors such as interest rates, Federal Reserve statements and indices, government releases on the economy, fiscal and monetary policy, prices of gold and oil, relative strength of the dollar and market-affecting remarks by government and business leaders. T. 816–17. In addition to market factors, Monagle's testimony clearly evidenced portfolio manager consideration of the credit risk of securities being considered for purchase, the average maturity of Fund investments and projected levels of purchases and redemptions by Fund shareholders.

In sum, the Court concludes that the Fund's performance has been superior and, while it is proper for the Trustees to consider performance on a risk-adjusted basis, plaintiff has failed to establish the Fund's inferior performance, given the Fund's use of the "mark-to-market" accounting method and the lack of acceptance in the industry of risk-adjusted return as a measure of performance. Moreover, the Court finds no fault in MLAM's portfolio management strategy and methods.

## 2. Shareholder Services

Fund shareholders are provided with an array of superior services and benefits by MLPFS, derived from MLPFS's field force of 11,000 financial consultants and sales assistants, and its extensive computer capability.

MLPFS supplies the services linking the Fund to the rest of the program. The MLPFS computer system processes and records all financial activity in program accounts, including securities transactions, Fund purchases and redemptions, VISA and check transactions, and account openings and closings, and processes and prints the CMA monthly statement that MLPFS mails to participants.

Shareholders receive personal customer service through MLPFS's network of financial consultants, one of whom is assigned to each customer opening a CMA account. Aided by sales assistants, the financial consultants provide investment advice and respond to customer queries on all aspects of the CMA program, including the Fund.

The Court concludes that MLPFS provides CMA Money Fund shareholders with a broad range of high-quality services. Shareholders reap benefits from MLPFS directly, as members in the Fund, and indirectly, because the Fund is part of the CMA Program. Direct benefits include personal attention to customer inquiries regarding the Fund, and VISA and checking services. Indirect benefits include the sweep feature that ensures that cash does not remain idle, association of the Fund with the margin account, which enables shareholders to make purchases on margin with their VISA cards and checks, the monthly statement, which simplifies record keeping, and additional attention paid to shareholders by financial consultants because they are members of a program which generates substantial commission revenue.

---

**33.** Monagle trades between 6.9 to 22.4% of the portfolio on average each day. Dx. D. Although Monagle is an active trader, the Fund portfolio is confined to a class of relatively conservative investments consisting of United States Treasury and agency obligations and short term paper issued by U.S.-domiciled corporations.

In sum, the Court finds the nature and quality of services received by Fund shareholders to be of the highest order.

## B. *Profitability to Merrill Lynch from the Fund*

*Gartenberg I* mandates consideration of the Fund's profitability to Merrill Lynch, a task made more formidable by the Fund's location within the CMA program. Defendants contend that Merrill Lynch loses money on the Fund, while plaintiff claims that the Fund, in the context of the CMA program, is highly profitable to Merrill Lynch.

To differentiate between the Fund and the rest of the program, the parties have drawn a distinction, adopted by the Court, between "fee based" and "non-fee based" costs and revenues. The fee based side of the CMA program includes the Fund, the VISA card and the checking privileges. T. 1054 (Peppet). The non-fee based side consists of the securities and margin accounts. The principle accounting disputes arise over the proper allocation of costs between the fee based and non-fee based sides. Of course, to the extent that greater costs are allocated to the fee based side of the program, the Fund's profitability to Merrill Lynch is reduced.

At the outset, the Court recognizes the impossibility of arriving at an exact profitability figure. *Cf. Schuyt*, 663 F.Supp. at 978 wherein this Court "acknowledge[d] that it is left in this case with the problem of uncertain profitability." Calculation and allocation of costs against different product lines or, in this case, among different segments of the same product, is an art rather than a science. Little certainty exists in this field where different, albeit rational, methodologies lead to widely disparate results. *See Id.* at 977–78. Hence, the Court must be satisfied with a common sense range of figures within which the Fund's profitability to Merrill Lynch most likely falls.

Three profitability studies are before the Court. In 1986, H. Allan White, director of finance for Merrill Lynch's consumer market sector, conducted an internal study of CMA program profitability for 1985. A year later, at Merrill Lynch's request and in preparation for this litigation, Peat Marwick & Mitchell ("PMM") completed a study for the years 1984–1986. PMM partner Russell F. Peppet directed the effort and testified at trial for the defendants. Finally, at plaintiff's request, Professor John Wesley Livingstone of Babson College analyzed the White and PMM studies and drew his own conclusions as to profitability. These three studies, each with its own weaknesses and strengths, estimated fee based pre-tax profits or losses (and profitability as a percent of total fee revenues) as follows (numbers are in thousands): [34]

|  | June 1986 | 1985 | 1984 |
|---|---|---|---|
| Livingstone | 55,474 (50%) | 72,033 (37%) | 47,531 (28.5%) |
| White | N/A | 19,823 (10.8%) | N/A |
| PMM | (16,243) (−17.5%) | (49,719) (−30.1%) | (77,741) (−55.8%) |

*See* Px. 77B, 77A, AT.

If adjustments to the PMM figures are made to remove the hotly disputed costs of financial consultants and sales assistants from the fee based side of the program, PMM's numbers are:

|  | June 1986 | 1985 | 1984 |
|---|---|---|---|
| PMM | 22,606 (24.3%) | 4,966 (3.1%) | (26,548) (−19.1%) |

Although the nature of profitability analysis renders an exact computation of Merrill Lynch profits impossible, it is safe to say that fee based profits fall somewhere in the range between the Livingstone and PMM positions. This range is

**34.** Pre-tax profits = Total fee based revenues, including float minus total fee-based expenses; profitability = pre-tax profits divided by total fee based revenues including float.

susceptible of further narrowing after a critical examination of the cost allocations made by PMM and Livingstone.

In considering profitability, the Court is mindful that the Fund's presence in the integrated CMA program enhances Merrill Lynch's ability to garner commission revenue. Fund assets are a pool of liquid assets available for investment in securities, and financial consultants target their securities sales pitches to Fund participants.

Costs within the CMA program must be properly allocated in any profitability study lest the Fund subsidize the costs of Merrill Lynch's commission-generating activities. To avoid this clearly improper result, costs attributable to the program as a whole (which may arise from more than one aspect of the program, including the Fund) must be allocated between the fee based and non-fee based sides of the program on some rational basis. With a view to better defining the range of probable profitability figures, the Court turns now to a closer examination of particular cost allocations advocated by the parties at trial.

### 1. *Financial Consultants and Rule 12b-1 Payments*

Financial consultants receive compensation from two sources for their services to the CMA program: commissions from Merrill Lynch for effecting securities transactions for CMA customers, and 12b-1 payments amounting to .11% of the CMA Money Fund assets under their control. Plaintiff argues that 12b-1 payments are fee based revenues to Merrill Lynch, but that the costs of both 12b-1 payments and financial consultants [35] are allocable to the securities or non-fee based side of the CMA program. This treatment, of course, has the effect of greatly enlarging fee based profitability. Not surprisingly, defendants disagree with this accounting approach.

■ The Court agrees with defendants that 12b-1 payments are neither a revenue [36] nor an expense to Merrill Lynch. Through Merrill Lynch, the Fund pays these monies to the financial consultants for services to shareholders and for selling Fund shares. MLPFS performs a purely administrative function in receiving and dispensing the payments, for which it is reimbursed 1.5 basis points out of the 12.5 basis point 12b-1 fee. The 12b-1 payments do not appear on any of Merrill Lynch's consolidated financial statements, nor on MLPFS's own statements. T. 1070 (Peppet). The Court accepts Peppet's view that 12b-1 payments have no place in a study of profitability to Merrill Lynch.[37]

■ Defendants argue that general costs to Merrill Lynch for financial consultant and sales assistant work on the Fund should be partially attributed to the fee based side of the program. The Court agrees that in theory costs to Merrill Lynch of financial consultant and sales assistant time devoted to fee based activities, net of 12b-1 payments so as to avoid double counting, should be allocated against the

---

**35.** Also at issue is the appropriate accounting treatment of sales assistant costs. Sales assistants assist the financial consultants in providing services to the CMA program customers and are paid a salary for their services. For the reasons stated below, the Court treats the costs of these services in the same manner as those attributable to the financial consultants.

**36.** The Court is aware that Merrill Lynch benefits by having a larger fund from which to prospect for commissions and financial consultants who are focusing their attention on the Fund. Plaintiff, however, has failed to quantify these benefits and the Court, therefore, cannot include them in a profitability study beyond noting their probable existence.

**37.** Plaintiff argues that 12b-1 payments are revenue to Merrill Lynch but may not be costed against the CMA program because the payments are ineffective in achieving their stated goal—growth of the Fund. The Court rejects this argument. First, plaintiff has failed to demonstrate that the 12b-1 payments have not contributed to the growth of the Fund. Second, the payments are distributed not only to encourage growth, but also to stimulate improved shareholder service. Finally, even if the payments were ineffective, the Court remains unpersuaded that these costs are not attributable to the product which causes them to exist. Even Livingstone agreed that, including 12b-1 payments as a fee based cost "is within the realm of reason." T. 215.

fee based side of the CMA program.[38] Although Merrill Lynch pays its financial consultants on the basis of the securities transactions they effect, this does not mean that the time they spend on Fund matters is of no cost to Merrill Lynch or of no benefit to the Fund.[39] Any such costs, net of 12b–1 payments, may be attributable to the fee based side.

The Court finds, however, that there is a failure of proof as to the quantity of financial consultant and sales assistant costs properly attributable to the Fund. In an effort to quantify the financial consultant costs to the CMA Money Fund,[40] PMM conducted a time study in October 1986 to determine the percentage of financial consultant time spent on fee based activity.[41] *See* T. 1122–40. PMM then allocated this percentage of the entire financial consultant cost pool [42] to the fee based side of the program.

PMM studied 35 out of 480 branch offices, chosen on the basis of size and geographical dispersion. Two PMM representatives spent two or three days at each of the 35 offices observing the financial consultants. During this time, PMM representatives periodically asked the financial consultants and sales assistants what they were doing. If the financial consultant or sales assistant was on the phone, the representative would present him with a placard listing various activities. The sales person then pointed to the activity in which he was engaged. The placard listed: CMA (fee based activities and CMA account openings); CMA combined (both fee based and non-fee based activities; such as a securities transaction performed with Fund assets); Other Product/Account; Personal; and General Office Administration. In calculating time spent by financial consultants on the Fund, PMM considered only time spent on CMA fee based activities.

PMM concluded that during the two or three days of the study, the financial consultants observed spent approximately 5.9% of their time on CMA fee based activities and account openings. PMM then applied 5.9% against the financial consultant cost pools for 1984, 1985 and 1986, subtracted the amount of the 12b–1 payments and arrived at what Peppet believed to be a conservative figure for financial consultant cost.[43]

**38.** Plaintiff's argument that such time may be costed only against non-fee based revenues, since any financial consultant service to Fund shareholders is motivated solely to enhance commission business, is unpersuasive. Relying upon some theory of underlying or true motivation would lead to even greater uncertainty in ascertaining profitability than already exists. Such a theory could lead to anomolous results due to the inherent difficulty of ascertaining the motive underlying a business decision. Accordingly, the Court rejects plaintiff's attempt to inject motivation into the profitability calculus and accepts Peppet's testimony on this point.

**39.** The Court rejects Livingstone's argument that because Merrill Lynch pays financial consultants for selling securities, to charge the Fund with a portion of the expense of paying these commissions is to require the Fund to pay for Merrill Lynch's securities business. The fact that Merrill Lynch chooses to compute payment for financial consultants on the basis of the results they achieve in one area of their work does not mean that that payment does not compensate them for all their activities at Merrill Lynch. The Court is supported in this result by the credible testimony of White and Peppet and the opinion of Judge Pollack in *Gartenberg II*, 573 F.Supp. at 1310. ("The fact that MLPFS

account executives are not remunerated on a straight time basis does not mean that the time they devote to MLRAT activities has no value to MLPFS or is uncompensated in the payments received by the account executives.")

**40.** White made no attempt to calculate the costs of the sales force because he modeled his study after the earlier PMM analysis of CMA which did not include these costs.

**41.** He performed an identical study to determine allocable sales assistant costs.

**42.** The pool includes: salaries (⅔ of the total financial consultant cost pool for 1985), fringe benefits, overtime and supper money, communications, occupancy and equipment rental, brokerage clearing, supplies and postage and market development. The Court notes that PMM found it possible to allocate fringe benefit costs in this case although no such costs were calculated for revenues. In addition, some of the costs in the financial consultant pool appear unrelated to the Fund.

**43.** To determine fee based sales assistant costs, PMM arrived at a figure of 9.2% of time spent on fee based activities and applied it against the total sales assistant cost pool.

The Court finds the PMM time study to be of little probative value in assigning costs. As Livingstone credibly testified, "the study assumes that conditions in the second half of October, 1986 will prevail throughout the first 6 months of 1986, throughout all of 1985, and all of 1984 ... a very slender foundation on which to base such a sweeping assumption." T. 96. Moreover, PMM workpapers showed that time spent by financial consultants on CMA fee based activities varied in some offices by as much as 33% within the two days of observation. The Court credits Livingstone's testimony that Peppet's results were speculative. Indeed, Peppet himself conceded that "we can only say ... that these statistical results relate to the 2 weeks under observation during our sample."[44] T. 1139.

Accordingly, the Court finds the PMM study to be so seriously flawed, both as to method and as to the speculation of its conclusions, as to be an inappropriate basis upon which to apportion financial consultant and sales assistant costs against the Fund. While the Court must eliminate the amount of these costs from its calculation of a profitability range, the Court makes no finding that assigning some such costs always would be inappropriate, merely that the PMM time study does not permit it in this case.

### 2. *Monthly Statement, New Account Processing and Marketing Costs*

Briefly reviewing other aspects of the PMM study, the Court finds that PMM charged costs incurred by Merrill Lynch in running the CMA program solely against the Fund, instead of allocating these costs between the fee based and non-fee based sides of the program. For instance, PMM assessed all costs of CMA new account processing, monthly statements and CMA program marketing against the fee based side of the program. The Court perceives no basis for allocating all of these costs against the Fund. On the other hand, a discernible portion of these costs is directly related to the Fund and may be so allocated. While the Court is quite certain that the PMM study over-estimates the amount of these costs attributable to the Fund, plaintiff has failed to demonstrate the extent of such over-estimation.

### 3. *Float Costs, Systems Excess Capacity, Imputed Income and Wire and Order Costs*

■ Profitability analysis flaws are not confined to the PMM study. Livingstone's study is also flawed. Livingstone contended at trial that Merrill Lynch incurs float costs as a result of delays in charging VISA and check transactions in excess of available funds (so-called declines and overrides). He argued that delays occur due to Merrill Lynch's "extraordinary forebearance" when CMA customers write checks or incur VISA charges in excess of available funds. T. 60–64. Specifically, Livingstone testified that, in some cases, a CMA customer's refusal to pay "simply stands and Merrill Lynch doesn't do anything about it," and in others the customer is given time to meet his overdraft. T. 62. Livingstone stated that this procedure is consistent "with treating the customer so well in order to pursue the major business of the CMA program, which is securities." T. 63. Thus, Livingstone argued, float costs should be charged against the non-fee based side of the program.

The Court rejects this argument as speculative. Since decline/override float costs are incurred in the administration of the fee based VISA debit and check-writing components of the CMA program, the Court finds that these costs are appropriately charged against fee based revenues.

Plaintiff also challenges PMM's inclusion in fee based computer systems costs of the cost of excess computer capacity required for the securities business. Livingstone, after noting a memorandum in the PMM workpapers indicating that one of the two

**44.** Peppet added that in 1984 and 1985 the volume of securities transactions was lower and therefore financial consultants probably spent more time on CMA fee based activities during those years. He thought "logically it seemed to me that, if anything, these were conservative numbers as applied to 1984 and 1985." T. 1140.

computer facilities used to service CMA operations has an excess capacity of 64%, assumed the existence of excess capacity at the other facility. T. 80–83. Livingstone attributed the need for this excess capacity to the securities business. *Id.* at 83–84.

The Court concludes that plaintiff has failed to show that these facilities have significant excess capacity which has been allocated improperly to the fee based side of the program. First, there is no evidentiary basis for Livingstone's assumption that excess capacity exists at the second facility. White and Peppet credibly testified that no such excess capacity exists. T. 1004–06 (White); T. 1109–10 (Peppet). Second, the Court accepts White's testimony that any excess capacity at the second facility is necessitated by CMA fee based transactions.

Plaintiff also claims that PMM erroneously excluded from its profitability study $1,750,000 per year of "fringe benefit" income earned by Merrill Lynch. According to Livingstone, the fact that Merrill Lynch waives the annual $65 CMA program fee for its employees means that the employees who participate in the Fund receive a fringe benefit from the Fund on behalf of Merrill Lynch. Livingstone testified that the amount of this fringe benefit should be included as a revenue to Merrill Lynch. T. 46–47.

Peppet and White agreed with Livingstone that it would be appropriate to impute foregone service fees as fringe benefit revenue to Merrill Lynch, but testified that this would require a corresponding allocation of costs to Merrill Lynch for fringe benefits received by CMA program employees. T. 1067–69 (Peppet); T. 978–79 (White). Livingstone agreed that this too would be appropriate.

White testified that he made a rough computation of fringe benefit cost and concluded that fringe benefit cost exceeds fringe benefit revenue to Merrill Lynch. T. 977–81. He excluded both these costs and revenues from his profitability study.

The Court finds White's testimony credible and his approach towards fringe benefit costs and revenues reasonable. Given Liv-

ingstone's concurrence that inclusion of fringe benefit costs for CMA program employees is appropriate, the Court excludes from both costs and revenues to Merrill Lynch, Merrill Lynch employee fringe benefits from the CMA program.

Plaintiff further claims that Wire and Order costs are more closely related to the securities side of the CMA program and, therefore, should be costed against the non-fee based side of the program. The Court finds that plaintiff has failed to substantiate this claim. White credibly testified that wire and order services are similar to those provided by an internal telex system and are used by the CMA program for manual subscriptions and redemptions from the Fund. T. 1010. The Court finds that such services are appropriately costed to the fee based side of the program.

### 4. *Corporate Overhead*

The method of allocating a portion of Merrill Lynch's indirect overhead costs to the fee based side of the program was hotly disputed at trial. Prior to 1985, Merrill Lynch had not even attempted any such allocation. In 1985, White merely assigned the same percentage of Merrill Lynch's total overhead to total corporate costs—4.2%—to the costs of the fee based side of the CMA program. T. 1014. The PMM study attempted a much more complex allocation by designating general cost pools relating to capital markets and consumer markets (the CMA program falling into the latter) and attempting to allocate general overhead costs, if possible, wholly to one or the other or, if not, in part to one or the other. Once a pool of general overhead costs was allocated broadly to consumer markets, it was further allocated to specific categories of consumer markets—the CMA program, securities, real estate, insurance and commodities.

Both the White and PMM approaches to overhead allocation were rational, albeit wholly unrelated, methods. While PMM's approach is by far the more sophisticated, plaintiff properly criticized it as leading to wide fluctuations in overhead cost allocation to CMA, due to factors unrelated to

the CMA program, such as the amount of securities business being conducted by Merrill Lynch as a whole and general market conditions.

In each of 1984, 1985 and the first half of 1986, the PMM corporate overhead figures, rounded to the nearest million, of $34 million, $21 million and $10 million ($20 million annualized) greatly exceeded White's 1985 number of about $5 million. Not surprisingly, plaintiff's expert Livingstone favored White's 1985 allocation of 4.2% of total costs, and argued that, for lack of comparable percentages for 1984 and 1986, 4.2% be utilized for those years as well. Since the Court cannot reject either the White approach or the PMM approach as irrational or unprincipled, the Court will consider "true overhead" for the three years to fall somewhere in the range of 4.2% of fee based costs up to the amount of the PMM allocation for that year.[45]

### 5. Conclusion as to Profitability

The average annual profitability for 1984 to 1986 estimated by plaintiff was 40.4%. Px. 77B. Defendants estimated average profitability for the same period to be −32.7%. Dx. AS. After having reviewed carefully the exhibits and the testimony relating to each of the profitability issues raised at trial, the Court concludes that a true profitability figure for the fee based side of the CMA program was probably less than plaintiff's estimate, but greater than the figure defendants urge. Based upon its own consideration of the profitability studies presented, in light of the pertinent testimony which the Court has evaluated, the Court concludes that a true figure for a three-year weighted average of pretax profitability would probably fall in a range from at least a few percentage points greater than 0% to perhaps as much as 33%.

### C. Fall Out Benefits

Fall-out benefits are indirect profits to Merrill Lynch attributable in some way to the existence of the Fund. Fall-out bene-

fits "to the extent quantifiable, should be taken into account in determining whether the Manager's fee meets the standard of § 36(b)." *Gartenberg I*, 694 F.2d at 932.

In *Gartenberg I*, the fall-out benefits at issue were securities commissions from trades for customers who were also shareholders in the RAT, and float income received between issuance and clearance of checks issued upon redemption of fund shares. The unresolved question in that case was the quantity of such fall-out benefits, particularly securities commissions, that could be said to have been caused by the RAT. The District Court accepted Merrill Lynch's contention that any such benefits could not be quantified. The Court of Appeals rejected this contention, but concluded that the burden rested with the plaintiff to "demonstrate that the benefits were so substantial that they rendered the Manager's fee so disproportionately large as to label its negotiation a 'breach of fiduciary duty' within the meaning of § 36(b)." *Id.* The Court held that plaintiff had failed to carry this burden.

In the instant case, fall-out benefits loosely fall into two categories that the Court denominates primary and secondary. Primary fall-out benefits include (1) commission profits from trades in the CMA program securities account; (2) margin interest; and (3) management fees derived from funds other than the Fund within the CMA program. Secondary fall-out benefits include profits earned by Merrill Lynch products and services outside the program, but sold to Fund customers, such as profits from transactions in real estate, life insurance and tax shelters, as well as profits to Merrill Lynch affiliates who transact with the Fund.

### 1. Primary Fall–Out Benefits

Plaintiff contends that Merrill Lynch derives enormous primary fall-out benefits from the Fund, particularly in the form of securities commissions. Defendants insist, as they did in *Gartenberg I*, that such fall-out benefits attributable to the Fund

---

**45.** PMM's corporate overhead allocations were: 1984—$33,868,000; 1985—$20,713,000; to June 30, 1986—$9,962,000 for a three-year weighted average of $25,737,000.

cannot be quantified, and therefore, are of limited use to the Trustees in determining the advisory fee. *See e.g.* T. 1019–21 (White); T. 1045–50 (Peppet). Peppet concluded that it was impossible to devise a technique that could determine which securities transactions would not have occurred "but for" the existence of the Fund. T. 1177–87; 1222–23. *See also* T. 1019 (White). He testified that each technique he considered was flawed in that it could not eliminate the variables influencing customers to transact in non-fee based products or other products outside the CMA program, such as market environment, fiscal policy, and customer demographics, and that it was not possible to isolate from these other factors the Fund's effect on securities profits. He therefore included as "footnote items" the total income earned by Merrill Lynch from CMA customers engaging in non-fee based activities, but did not attempt to set forth what portion of such income was connected to the Fund.[46]

Like defendants, plaintiff also has failed to quantify the amount of primary fall-out benefits to Merrill Lynch attributable to the Fund. Plaintiff simply proposes that the Court include, as primary fall-out benefits, *all* CMA program non-fee based income to Merrill Lynch, because these profits are integral to the CMA program of which the Fund is a part.[47] This goes too far. There is no reason to believe that a portion of these profits would not have been received in the absence of the CMA program or the Fund. Defendants are correct that to attribute a specific dollar figure to fall-out benefits, whether primary or secondary, requires a calculation of how much non-fee based and non-program profit would not have occurred *but for* the existence of the Fund. There is no such calculation in the record. The Court notes that while Merrill Lynch claimed an inability to tie a specific amount of primary fall-out benefits to the Fund, it did provide the Trustees with the total profits within which such benefits presumably exist.

This apparent impasse as to the amount of fall-out benefits attributable to the Fund need not be resolved for the fall-out benefit factor to play its rightful role. *Gartenberg I* does not proscribe any particular quantity of fall-out benefits beyond which the fee must be reduced to off-set gains therefrom. Rather, the thrust of *Gartenberg I* is that the plaintiff must show that the fall-out benefits are "so substantial" that they rendered the advisory fee "so disproportionately large as to amount to a breach of 'fiduciary duty' in violation of § 36(b)." 694 F.2d at 930. Put another way, fall-out benefits are one of the "surrounding circumstances" in the light of which the Court must apply the test of "whether the fee schedule represents a charge within the range of what would have been negotiated at arm's-length. . . ." *Id.* at 928.

■ In this case, since plaintiff has failed to quantify any primary fall-out benefits, he has necessarily failed to establish that such benefits, taken together with other "surrounding circumstances," render the advisory fee so disproportionately large as to be beyond "the range of what would have been negotiated at arm's-length."

### 2. *Secondary Fall–Out Benefits*

All parties recognized that Merrill Lynch might also earn profits from transactions by CMA program customers which might have a causal link to the existence of the Fund. However, as with primary benefits, neither side attempted to quantify any such secondary fall-out benefits attributable to either the Fund or the CMA program. Moreover, unlike the primary benefits, no totals of pools of possible secondary benefits were presented to the Trustees.

Merrill Lynch enjoys fall-out benefits when the Fund purchases securities from

---

**46.** The Court questions Peppet's inability to derive any meaningful figures on fall-out benefits to Merrill Lynch. It appears to the Court that use of regression analysis in combination with a customer survey, or some other combination of studies could lead to a useful result.

**47.** As a fall-back position plaintiff has also suggested five 20% increments of primary fall-out benefits attributable to the Fund, without establishing a basis for selecting any particular level.

another Merrill Lynch affiliate. Principal among these affiliates is Merrill Lynch Government Securities, Inc. ("GSI"), which sells to the Fund a small portion of the Fund's overall purchases. T. 839 (Monagle). For example, GSI, in its fiscal year ending March 31, 1986, sold $5 billion of government securities to the Fund (less than ½ of 1% of the amount of the Fund's total transactions) and earned profits thereon of about $12.5 million. Plaintiff did not attempt to prove benefits to Merrill Lynch affiliates as fall-out benefits derived from the Fund. In any event, such profits, at least as to GSI, are quite modest, since GSI, operating under an SEC exemptive order with respect to affiliated transactions, is permitted a spread of only .25% on transactions with the Fund.

As with primary fall-out benefits, plaintiff has advanced no basis for the conclusion that the secondary fall-out benefits were of such magnitude that, when combined with other circumstances, they would place the advisory fees received by the Fund beyond the range of what would have been negotiated at arm's-length.

### D. *Economies of Scale*

Plaintiff claims that Merrill Lynch benefits from significant economies of scale in managing the CMA Money Fund. Plaintiff's evidence on this point consists of five exhibits which, using numbers drawn from PMM's profitability study, express fee based expenses as a percentage of fee based revenues. The exhibits purport to show that this percentage decreased from 1984 to 1986 for most fee based costs and for the total Fund operating expenses to Merrill Lynch. Px. 87–91.

These exhibits are inconclusive. As Zeikel credibly explained, economies of scale "relate to the costs incurred in doing a unit of something," T. 731, and plaintiff's exhibits fail to demonstrate that the per unit cost of Fund transactions, such as VISA purchases, decreases as the number of units increases. In Zeikel's view, one must "try and create a detailed analysis of each element of a transaction surrounding the CMA program, over an extended period of

time, over different levels of activity, to determine whether or not there are economies of scale." *Id.* at 731–2.

The Court is persuaded by this testimony and finds that merely because the ratio of fee based expenses to fee based revenues declined at a time when the Fund size grew, that fact does not establish that such a decline was necessarily due to economies of scale.

The Court is also persuaded by Zeikel's testimony that there appear to be few economies of scale in managing the Fund. Although the per unit cost of providing management services directly to the Fund decreases as the Fund grows, the per unit cost of servicing Fund shareholders does not. As Zeikel credibly testified, money fund shareholders tend to transfer money in and out of their funds on a regular basis, and the per unit cost of processing these transactions remains constant regardless of the cost and does not vary with the size of the Fund or the number of accounts. T. 532–35.

The Court finds that plaintiff has not successfully demonstrated on this record that significant economies of scale accrue to Merrill Lynch in providing services to the Fund and its shareholders. At the same time, the Court notes that plaintiff's exhibits show that fee based expenses expressed as a percent of fee based revenues did decrease at a time when the Fund size grew. This suggests that there may be economies of scale of which Merrill Lynch and the Trustees are unaware. Accordingly, the Court's conclusion that plaintiff has a failure of proof on the issue of economies of scale should not be read as a finding that no substantial economies of scale exist, or as indicating that the question does not merit further exploration by the Trustees.

### E. *Comparative Expense Ratios and Advisory Fees*

Before commencing its analysis of the Fund's advisory fee in light of fees charged by other funds in the industry, the Court notes that fee comparisons of this Fund to funds that are part of central asset ac-

counts are more relevant than comparisons to stand-alone funds.[48] Because stand-alone funds differ from central asset account funds in their services to shareholders and in their role as a vehicle for holding a customer's assets, the prices charged for them are not entirely comparable. While the Court has considered expense ratios,[49] and effective fee rates of all money market funds, the Court deems most significant the advisory fees charged by other central asset account funds. Even so, such comparisons have limited value due to the lack of competition among advisors for fund business. *Gartenberg I*, 694 F.2d 929.

### 1. *Expense Ratio*

The expense ratio is obtained by dividing expenses by fund assets. Compared to both stand-alone and central asset funds, the Fund has one of the lowest expense ratios in the industry.[50] Compared to the nine central asset account funds, the Fund's expense ratio was lowest, and significantly below the average. Dx. M.

### 2. *Advisory Fee*

The Fund's effective advisory fee is also one of the lowest. At .38%, this fee was eleventh of forty-eight among retail money market funds with assets of over $500 million, Dx. K–1, and second of nine among central asset account funds. Dx. K–2. When all other fund effective fee rates are adjusted by hypothesizing $10 billion in assets, the Fund's rate still ranks in the middle range. Dx. BD.

With respect to central asset account funds, while the services offered by such funds are similar,[51] their fee structures vary considerably. The Fund's effective fee rate and expense ratios are among the least costly, but the Fund's fee "break points" are less advantageous than those of several other central asset account funds.[52]

The Court concludes that the Fund has neither the most nor the least advantageous fee available within the universe of central asset account funds or money funds generally—its fee is in the middle range of each category.

### F. *The $65 CMA Service Fee*

Plaintiff complains that Merrill Lynch "unilaterally imposes an annual service fee upon each shareholder in the Fund," and that Merrill Lynch raised this fee from $50 to $65 in December 1985 without consulting Fund Trustees. Further, plaintiff asserts that "[a]t no time have net yield figures for the Fund published by defen-

---

**48.** Plaintiff claims that the services provided by the RAT, which has a more advantageous advisory fee structure, taken in combination with services provided by a brokerage account, do not differ markedly from services offered by the CMA fund and the CMA program. The Court disagrees. Membership in the program entitles the Fund shareholder to many services, such as sweep, a comprehensive monthly statement and unlimited checking, which are unavailable to RAT shareholders who have securities accounts at Merrill Lynch.

**49.** The annual service fee of $65 per year is not properly includible in the Fund's expense ratio. The service fee is a program fee, paid by all CMA program participants, regardless of whether they hold shares in the Fund.

**50.** As reported by Lipper American Security Corporation, in the winter of 1986, the Fund's expense ratio, excluding the 12b–1 plan, was .430, placing it third of 138 among all retail taxable money market funds. Dx. I–1. With the 12b–1 plan, the Fund's expense ratio was .555, placing it eighth of 138. Dx. L–1.

**51.** The Fund offers services comparable to those offered by other central asset account funds. Several "premium" funds provide an optional "gold" debit card and travel services and charge a higher services fee to participants who wish to use the gold card. Apart from these premium services, there is little to distinguish the various central asset account funds. Differences the Court does note: most central asset account funds have lower charges on return items, several have more advantageous sweep, and most charge shareholders for issuance of additional checks. A few charge shareholders for checking services if the account balance falls below a stated minimum. *See* Ex. AI and AJ.

**52.** At the high end of the fee range are five funds with a flat advisory fee of .5%. One fund has an identical fee structure to that of the Fund. The eight others have either flat rates below the effective fee rate of the Fund, or graduated fees with final break points below the Fund's. *See* Dx. BG.

dants reflected any reduction for the annual service fee." Plaintiff's proposed findings of fact at ¶ 17.

First, the Court notes that all CMA participants pay the service fee whether or not they are Fund shareholders. Further, the existence of the fee is fully disclosed to potential CMA program participants. All CMA participants must execute a CMA Agreement whereby they agree to pay the annual service fee. A CMA Program Description is explicitly incorporated into the CMA Agreement and advises that

> [t]he Money Accounts have been created for the sole purpose of being component parts of the CMA program and, in view of the service fee, those persons seeking solely to invest cash in a money fund or to deposit cash in a money market deposit account and not to use the special features of the CMA program should consider as a more suitable vehicle other money funds or money market deposit accounts offered directly to the public.

Px. 1 at iii. The Program Description also advises potential CMA program participants that there are other existing money funds with similar investment objectives to the Fund and which offer check-writing privileges. *Id.*

▮ The fee itself is a reasonable means by which to seek to hedge against the entrepreneurial risk incurred in setting up and maintaining the CMA program, especially in light of the intensely competitive market environment.

It was not unreasonable for Merrill Lynch to exclude the service fee from the computation of the Fund's yield. Similarly, it was not unreasonable for the Fund Trustees to fail to reduce the advisory fee or the 12b–1 payments as a result of the December 1985 service fee increase.[53] CMA participants pay the service fee directly to Merrill Lynch, not to the Fund. As noted, the fee is paid for participation in the CMA program, regardless of participation in the Fund. The service fee is used to defer costs of the entire program, not just the costs of the Fund. Further, Zeikel credibly testified that to allocate the $65 fee over the different CMA program segments, while possible in the "conceptual sense," was "from an analytical viewpoint very difficult to do." T. 782. Zeikel also testified that at the time the decision to hike the service fee to $65 was made, the cost of providing the services in the CMA program had increased. *Id.* at 777–79.

## G. *Rule 12b–1 Plan Fees*

▮ The fees paid by the Fund under its Rule 12b–1 plan are properly the subject of consideration by the Trustees and the Court in determining the appropriateness of the advisory fee under § 36(b). To the extent that the 12b–1 fees are excessive for the purpose intended, they should be considered with the advisory fee to determine whether payment of the two, in combination, amounts to a breach of fiduciary duty by the Trustees under § 36(b).

Rule 12b–1 of the Securities and Exchange Commission, 17 C.F.R. § 270.12b–1 (1987), prohibits an open-ended investment company, such as the Fund, from acting as a distributor of its own shares except under conditions prescribed by the SEC. A Fund is deemed to act as a distributor of its own shares when it "engages directly or indirectly in any activity which is primarily intended to result in the sale of shares issued by such company...." *Id.* at § 270.12b–1(a)(2). Any payments made by a fund "in connection with such distribution" must be made pursuant to a written plan approved by a majority of the shareholders, the fund's independent directors and its board. The Rule also provides that a 12b–1 plan may be implemented or continued "only if the directors who vote to approve such implementation or continuation conclude, in the exercise of reasonable judgment and in light of their fiduciary duties under state law and under § 36(a)

---

**53.** Although the record is unclear as to whether the Trustees were informed of the increase to $65 prior to such increase, the record does establish that subsequent to the increase, "[i]n considering the [1984–85 CMA profitability study], members of the [Audit] Committee also noted that future service fee revenues would increase as a result of the phasing in of the new $65 annual fee." Px. 12 at 6. *See also* T. 1404–05 (West).

and (b) (15 U.S.C. 80a–35(a) and (b)) of the Act, that there is a reasonable likelihood that the plan will benefit the company and its shareholders...." *Id.* at § 270.12b–1(e).

■ Plaintiff, without stating the relief he requests, claims that the Fund Trustees adopted and continued the 12b–1 plan in breach of the fiduciary duties established under Rule 12b–1 and § 36(b). The Court presumes that plaintiff seeks a declaration that all or part of the 12b–1 payments is excessive and, to the extent that causes the advisory fee to be excessive, that the latter should be ordered reduced in like amount.

Plaintiff challenges the 12b–1 plan on several grounds: (1) the plan does not benefit the Fund; (2) any benefits of the plan accrue only to Merrill Lynch; (3) the plan was adopted for reasons unauthorized by Rule 12b–1; and (4) the Trustees, who did not attempt to quantify the benefits of the plan to the Fund, did not act independently or reasonably in adopting it. The Court addresses each of these claims separately.

Plaintiff argues that the plan does not serve Fund shareholders because it does not promote Fund growth and, even if it does, larger funds perform no better than smaller funds.

According to Livingstone, 12b–1 payments are an ineffective stimulus to financial consultants to pursue Fund growth because the payments are insignificant in comparison to commissions earned by financial consultants on securities transactions. T. 213–14. In his view, financial consultants have a substantial incentive to convince clients to invest in a securities account and little or no incentive to induce them to place their money in the Fund. *Id.*

Livingstone's testimony that the 12b–1 plan does not promote growth is unpersuasive. The fact that securities commissions are higher than 12b–1 fees does not necessarily mean that the plan fails to motivate financial consultants to sell Fund shares.

The stated purpose of the plan was to provide financial consultants with an incentive to induce customers to put their money in the CMA Money Fund rather than banks or other money funds. Dx. AY at 11–12. The discrepancy between their commission salary and 12b–1 payments bears no relationship to financial consultant incentive to promote the Fund as a better investment vehicle than banks or other funds.[54] Although assessment of the effectiveness of incentive programs is not without difficulty, the Court finds that the 12b–1 plan has contributed to the growth of the Fund.

Plaintiff also contends that a large fund does not benefit Fund shareholders; in other words, that "bigger" is not necessarily "better." In support of this argument, plaintiff points to the expert testimony of Columbia Graduate School of Business Professor Selden, who described a series of studies he performed to discover what, if any relationship existed between the size of a fund and its investment performance. Selden analyzed data from 104 money market funds, excluding the CMA funds and all other Merrill Lynch funds, and concluded that the investment performance of a fund is not affected by the fund's size. T. 332–341; Px. 70–72. *See Forbes*, Sept. 8, 1986, "Annual Mutual Funds Survey." Selden testified, however, that "to the extent that increase in the size of the fund produces results in lower expenses, then it would seem to me that the shareholder would benefit." T. 339. On the basis of Selden's testimony, plaintiff argues that the Fund has not benefitted from its size, since it has no fee break points after $1 billion in assets.

After careful consideration of the methodology and conclusions of Selden's studies, the Court accepts Selden's analysis to the extent that the Court finds that plaintiff has shown that size *per se* does not noticeably affect investment performance, except insofar as a fund's expense ratio

---

**54.** Plaintiff also claims that 12b–1 payments create no more incentive to distribute Fund shares than does the prospect of gaining securities commissions from CMA clients. Although the Court agrees with plaintiff that the availability of Fund assets for securities transactions encourages financial consultants to promote the Fund, the Court cannot conclude that the 12b–1 payments provide no additional incentive to sell Fund shares.

may decrease with size.[55] This conclusion does not necessarily imply, however, that the 12b–1 payments are not justifiable on other grounds, for the Court is persuaded that an inflow of assets to a fund has a positive effect on investment performance regardless of the fund's absolute size. In other words, while "bigger" may not be better *per se*, "getting bigger" is better. Conversely, when a fund is losing assets due to increased redemptions, the fund is more difficult to manage.

The Fund's portfolio manager Joseph Monagle credibly described the difficulties faced in managing a fund with a declining level of assets.[56]

> It becomes much more difficult to manage when we are having an outflow of cash out of the portfolio. In a declining asset size, it puts us in a situation whereby we may be forced to sell securities at an inopportune time, which could force the shareholders to absorb lower yields than necessary if we were not forced to sell at that specific time.

T. 842. Monagle would not make a "blanket statement", T. 845–46, that outflow negatively affects yield because general market conditions are so important in de-

termining yield, but he commented credibly "that if I had to make a statement, I would think that in a stable or increasing flow of funds, the rate of return to shareholders would be better." T. 846. The Court accepts Monagle's testimony that lower yields tend to result from net redemptions since timing discretion is limited and, conversely, that net purchases tend to improve performance.[57]

The Court thus concludes that the 12b–1 plan benefits Fund shareholders. Although no one has suggested a way to quantify the yield advantage, this does not mean that these benefits are ephemeral and cannot be taken into account by the Trustees. In addition, Fund shareholders benefit by improved service resulting from 12b–1 payments.[58] They may also benefit by the recruitment and retention of better management personnel who may be attracted to a larger fund.

Plaintiff also claims that the 12b–1 plan was adopted to benefit Merrill Lynch rather than the Fund. The Court has no doubt that the 12b–1 payments accrue to Merrill Lynch's advantage. The Court agrees that Merrill Lynch's asset accumulation strategy is facilitated by the 12b–1 plan.[59] The

---

**55.** Monagle testified that larger funds have more economic clout in the marketplace. T. 824, 827–30. While this testimony has some force, based on Selden's testimony, the Court finds that bargaining power has a negligible effect on fund performance.

**56.** Monagle based this testimony on his experience as portfolio manager for the RAT when the RAT lost 40% of its assets between December 1982 and December 1983. T. 843.

**57.** Plaintiff attempts to undermine Monagle's testimony by arguing that (1) since Merrill Lynch manages $35 billion of assets in its various money market funds, its economic clout could not be diminished noticeably by the loss of $4 billion from the CMA fund, and the Fund's yield is insulated during periods of net redemptions; (2) the CMA Money Fund portfolio is so actively traded that an outflow of assets could have little effect on the Fund's performance; and (3) the performance of the Fund has declined following the adoption of the 12b–1 plan and the addition of assets to the Fund.

The evidentiary support for these arguments is minimal. First, although Merrill Lynch pools the intellectual resources of its management personnel, it does not pool the assets of its

funds. Nor has plaintiff introduced evidence to show that an actively traded fund dwarfs the impact of a negative flow of cash. Indeed, the only witness questioned on this point, Trustee West, stated that even with trades of upwards of $3 billion per day, an inflow of $50 million could be important to the portfolio manager. T. 1449–50. Finally, although the Court notes a downward trend in the Fund's performance from 1984 to 1986, the Court also sees that the Fund's performance, as compared with that of other domestic prime funds, was substantially lower in 1983 than in 1982 or 1984–86. In sum, the Court finds that plaintiff has failed to prove that asset inflow is not an advantage to the Fund.

**58.** The Court credits the testimony of Walsh and Zeikel that since the introduction of the 12b–1 plan financial consultants have paid more attention to the needs of the Fund shareholders.

**59.** In addition, a large fund generates more income to Merrill Lynch in the form of advisory fees. "[T]he CMA service generates a substantial amount of fee-based income for the Firm, which goes right to [Merrill Lynch's] bottom line." Px. 26 at 1003. The Trustees also discussed the possibility that financial consultant

CMA program's competitive position in the central asset account market and money fund market is also enhanced. Walsh and Zeikel credibly testified that the 12b–1 plan has improved client satisfaction with the CMA program. T. 960–62 (Walsh); T. 609, 711–14 (Zeikel). The 12b–1 payments give the financial consultants a "shot in the arm" to promote the program through the Fund, and this helps Merrill Lynch compete with firms offering similar products. Indeed, the Trustee deliberations reflect concern both for the CMA program's place in a competitive market and the strength of the CMA program.[60] However, the fact that Merrill Lynch benefitted by the adoption and retention of a 12b–1 plan does not render the plan improper. It is merely one factor for Trustee consideration.

Plaintiff also asserts that use of 12b–1 payments to encourage better shareholder service and to maintain Fund size violates Rule 12b–1. The Court disagrees.

The Court concludes that disbursements by the Fund for shareholder services and maintenance of Fund size are among the expenditures the SEC wished trustees to consider in the context of Rule 12b–1's restrictions. Rule 12b–1 subjects all payments made "in connection with a distribution" to scrutiny and defines distribution as the direct or indirect financing of "any activity which is primarily intended" to result in the sale of fund shares. Payments to financial consultants to halt the out-flow of assets and improve shareholder service are consistent with this definition, so long as the *primary* intent is to increase the size of the Fund. Moreover, even if payments for shareholder service and maintenance of Fund size are not "distribution payments," *per se*, they are made "in connection with" a distribution and are therefore to be regulated by the 12b–1 plan. In sum, the Court holds that plaintiff has failed to show that these 12b–1 payments were not made in connection with activity primarily intended to result in the sale of

Fund shares. Indeed, all witnesses credibly testified that the sale of Fund shares is exactly what the plan was supposed to promote. T. 595–97, 604–05, 711–16 (Zeikel); T. 917–20 (Walsh); T. 1424 (West); White Dep. 28; Forbes Dep. 50.

Finally, plaintiff claims, but has failed to prove, that the Trustees exercised neither independence nor good business judgment in adopting a plan. Rule 12b–1 does not require trustees to reduce to a dollar figure the benefits they expect a fund to receive from a plan. Nor, viewing the evidence as a whole, can the Court say the Trustees acted unreasonably. The Trustees considered the factors set forth in the applicable SEC release, examined all of the extensive information provided them by Merrill Lynch, and exercised their business judgment. Finally, the Court has found that the Fund benefits from the existence of the 12b–1 plan. In sum, the Court does not find the Rule 12b–1 plan or any payments thereunder to be improper.

## H. *The Trustees: Expertise, Knowledge, Care*

To determine if the Trustees, in approving the advisory agreement, fulfilled the fiduciary obligations imposed upon them by § 36(b) of the Act, the Court must examine that approval in light of all the surrounding circumstances. *Gartenberg I,* 694 F.2d at 928. The Court will not ignore a responsible decision by the Trustees, including a majority of the unaffiliated Trustees, to continue the fee structure as it stands. At the same time, "even if the trustees of a fund endeavored to act in a responsible fashion, an advisor-manager's fee could be so disproportionately large as to amount to a breach of fiduciary duty in violation of § 36(b)." *Id.* at 930.

The Second Circuit directs consideration of three factors by a district court: (1) the expertise of the unaffiliated trustees; (2) whether they were fully informed as to all

turnover may be reduced with the introduction of the plan. *See e.g.* Px. 11 at 4.

**60.** Like the 12b–1 benefits to Fund shareholders, the advantages of the 12b–1 plan to Merrill

Lynch have not been quantified. The Court, however, has no doubt that the benefits are substantial.

facts bearing on the advisor-manager's service and fee; and (3) whether they exercised care and conscientiousness in the performance of their duties. *Id.*

As to the first factor, the Court finds the Trustees of the CMA Money Fund to have been highly qualified for the tasks before them. Trustees Forbes and West held significant academic positions in the investment field and the other Trustees brought to the Board extensive business experience in finance and investments. *See* Dx. AP–1, AP–2(a)–(f).

As to the second factor, Merrill Lynch provided the Trustees with a wealth of information pertinent to an evaluation of the advisory fee and the 12b–1 plan. The 1985 and 1986 Director's Manuals, the 1984, 1985 and 1986 Green Books and preliminary meeting agenda presented exhaustive information on such subjects as the Fund's performance and expense ratios, its portfolio structure and trading activities, the 12b–1 plan, including its impact on expense ratio, total income and yield, as well as comparative information on other funds. Audit Committee meetings were replete with presentations on such topics as Fund portfolio management, financial consultant reactions to the 12b–1 plan, and profitability studies. *See* Px. 10, 12; Dx. AM. Clearly, Merrill Lynch kept the Trustees fully informed as to information pertinent to their deliberations.

As to the third factor, the Court also finds that the Trustees approached their decisions with conscientiousness and care. While the Court recognizes, as did Con-

gress in enacting § 36(b), that, by the nature of the mutual fund industry, Fund Trustees and the advisor-manager are not at true arm's-length, the Trustees did consider the information received and did conscientiously apply it according to the standards set forth in Second Circuit case law.

Section 36(b) of the Act provides that courts should give director and shareholder approval of advisory compensation agreements "such consideration . . . as is deemed appropriate under all the circumstances." 15 U.S.C. § 80a–35(b)(2). "Inasmuch as the Court finds that the [unaffiliated Trustees] were qualified, fully informed, and extremely conscientious individuals, the [Trustees'] approval of the fee should be weighted heavily." *Schuyt*, 663 F.Supp. at 988. The Court gives this approval such weight here.

## I. *Conclusion as to the § 36(b) Claim*

■ Plaintiff has failed to prove that, in light of the totality of the surrounding circumstances, the advisory fee received by MLAM was "so disproportionately large that it [bore] no reasonable relationship to the services rendered and could not have been the product of arm's-length bargaining." *Gartenberg I*, 694 F.2d at 928. The Court has found that the Fund shareholders, in the context of this central asset account, received services of a high caliber, that profitability to Merrill Lynch from fee based activity was well within the realm of reasonableness, even without downward adjustment for costs of financial consultants and sales assistants,[61] that plaintiff

---

**61.** The Court notes that in *Schuyt*, Judge Ward found profitability over a three-year period to be 59.1%, 66.8% and 77.3% respectively. After applying a stipulated tax rate of approximately fifty percent, the Court calculated profitability as approximately 29.5%, 33.4% and 38.6% for the three years. 663 F.Supp. at 978–79. Judge Ward concluded that

> [w]hile it cannot be denied that the Adviser [sic] earned a significant profit from these services, it does not appear to the Court, in light of all of the facts, that the fees charged by the Adviser [sic] were so disproportionately large that they bore no reasonable relationship to the services rendered and could not have been the product of arms-length bargaining.

*Id.*

Judge Ward also stated that he was not holding that profitability of up to 77.3% could never be excessive, but that, on the facts of that case, the fees were within an arm's length range. *Id.* at n. 77. He stated that such a figure could be excessive if, for example, the advisory services were not of the highest quality, and the advisors were not "so obviously qualified, fully informed, and conscientious. . . ." *Id.*

In the instant case, of course, the Court finds profitability to be much less than in *Schuyt* and also finds the advisory services to be of the highest quality and the Trustees to be highly qualified, fully informed and conscientious.

has not proved significant economies of scale, that the Fund is well within normal and acceptable industry ranges as to both expenses and fees, that the 12b–1 plan was neither improperly adopted nor implemented, and that the Trustees were qualified, well informed, and conscientious and careful in their deliberations approving both the advisory fee and the 12b–1 plan. Thus, the Court has no hesitation in concluding that there was no breach of fiduciary duty under § 36(b) by MLAM or any other Merrill Lynch affiliate.

## IV. *The Proxy Statement Claims*

Plaintiff also alleges that on July 26, 1984, the defendants caused the Fund to send to its shareholders a materially false and misleading proxy statement for the August 31, 1984 annual meeting. Px. 21. Plaintiff claims that this proxy statement identified comparative fees charged by the defendants for services to other funds and stated that the fee charged to the Fund averaged at approximately .38% of the Fund's asset value, *Id.* at 9, but omitted to state that the fee for the only other fund of comparable size, the Merrill Lynch Ready Assets Trust ("RAT"), averaged approximately .34% of the asset value. Plaintiff also alleges that the proxy statement failed to disclose other material facts relating to defendants' profitability.

Plaintiff brings his claim under Section 20(a) of the Investment Company Act, 15 U.S.C. § 80a–20(a), and Rule 20a–1 promulgated thereunder, 17 C.F.R. § 270.20(a)–1 (making the proxy rules promulgated pursuant to § 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), applicable to securities issued by investment companies). The proxy rule applicable here is thus Rule 14a–9, 17 C.F.R. § 240.14a–9(a) which provides that:

"(a) No solicitation subject to this regulation shall be made by means of any proxy statement, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in the light of the circumstances under which it is made, is false, or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

The principal question upon which this claim turns is whether any of the alleged undisclosed facts were "material." The Supreme Court has declared that a fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). Materiality cannot be determined in the abstract. The resolution of the question focuses on the significance of the omission to a reasonable shareholder's decision and requires consideration of the "total mix" of available information to see whether the omitted fact would have been viewed by the reasonable shareholder as having altered that "total mix." *Id.; see also Spielman v. General Host Corporation,* 402 F.Supp. 190, 194 (S.D.N.Y.1975) (Weinfeld, J.).

Viewed in the light of the foregoing standard, the Court holds that the defendants' alleged failure to state that the RAT's average fee was .34% was not a material omission. The proxy statement did not purport to set forth average fees for *any* of the funds that MLAM managed; thus, this is not a case where shareholders were affirmatively misled into believing that the average fee for the RAT was something other than .34%.

The proxy statement did set forth the fee rates of every MLAM managed fund before the *first* breakpoint, including the RAT and the Fund at .50%, and indicated at what asset level the first breakpoint occurred. Px. 21 at 7. It defined "break point" as "the level of net assets at which the advisory fee is reduced." *Id.* at 8. By doing this, the statement alerted readers to the fact that there could be other breakpoints as to the funds set forth, including the RAT.

The omission of the RAT's effective fee of .34% was immaterial for several reasons. First, the RAT and the Fund are significantly different. The RAT is a stand-alone fund, while the Fund is a component of a central asset account. The two funds were not competing for the same customers. Indeed, the Fund was not being recommended by Merrill Lynch at the time to persons who were seeking solely to invest cash in a money fund. *See* Px. 1 at iii. In addition, a comparison of the average fees of the RAT and the Fund was inappropriate, since an assessment of the Fund's fee involved considerations based upon the Fund's place in the CMA Program, including the benefits to shareholders of the program as a whole, that did not apply to the RAT. Moreover, although the Fund shareholder was not told the RAT's average fee rate in the Fund proxy statement, this information was readily available to any interested person, most recently in the RAT proxy statement sent to its shareholders approximately five weeks earlier on June 18, 1984, Px. 20, as well as in industry-wide publications, and thus was part of the "total mix" of information available to any shareholder who wanted it. Finally, it should be noted that while plaintiff seeks to make much of the difference between the effective fee rates of .38% and .34%, such a .04 differential, amounting to forty cents annually for each $1000 invested, would have meant very little to a prospective Fund shareholder.

Similarly, the omission from the shareholder proxy statement of a statement regarding the profitability of the Fund or the CMA Program to Merrill Lynch was not material. A similar claim was made and rejected by this Court in *Schuyt*, 663 F.Supp. at 989–990. Such information is neither customary nor required by the Securities and Exchange Commission and, as *Schuyt* held, is generally not material to a shareholder decision. *Id.* As this opinion painfully demonstrates, profitability analysis is no simple task. As Judge Ward stated in *Schuyt*, 663 F.Supp. at 990,

> [Profitability] information would be extremely confusing to the average shareholder and would require extensive discussion of full-cost accounting and the assumptions underlying the [cost allocation] system to be accurate and understandable. The Court is unwilling to impose this type of burden on defendants, particularly in the absence of evidence that such information is useful to shareholders.

For the foregoing reasons, the Court finds plaintiff's proxy violation claim to be without merit.

### Conclusion

Plaintiffs' claims are dismissed. Defendants may enter judgment accordingly.

SO ORDERED.